HOPKINS, J. T. C.
These are 28 consolidated appeals from the judgments of the Union County Board of Taxation for the years 1975 through 1979 involving 21 separate properties owned by Overlook Hospital Association. Five of the appeals have been brought by the hospital. The remainder were filed by the City of Summit.
The issues involved are (1) whether nearby properties which the hospital used to house various employees are exempt from local property tax pursuant to N.J.S.A. 54:4-3.6 and (2) whether Block 94, Lots 23 and 26, formerly exempt under N.J.S.A. 54:4-3.6, when improved by single-family dwellings, remained exempt when the structures were demolished and the property used as a buffer zone adjacent to the parking area for an apartment building used to provide housing for hospital employees.
Overlook Hospital Association is a nonprofit New Jersey corporation organized for hospital purposes. The hospital began operations in the City of Summit in 1906 as a proprietary hospital, and in 1914 became a voluntary, tax-exempt, nonprofit corporation. It is located in Summit and serves a primary care area with a population of approximately 350,000. In conjunction with several other hospitals in the region it also serves a secondary care area which has a population of an additional 350,000. The hospital presently has 599 beds, including 48 *186 bassinets. It has 1,700 employees, a medical staff of 400 physicians and surgeons and approximately 2,000 volunteers. Its corporate body consists of contributors to the Association and numbers between 4,000 and 8,000 a year. It is licensed by the State of New Jersey and accredited by the Joint Commission on Accreditation of Hospitals.
The hospital provides a broad range of services to the community, including acute care medical and surgical beds and services, ambulatory out-patient services, home-care services, facilities for a family practice, around-the-clock emergency room, coronary care, intensive care units, fully equipped laboratories, a variety of diagnostic and therapeutic x-ray equipment and cardiac laboratories. In addition, it operates special facilities such as an alcoholism treatment and counseling center.
Overlook is a teaching hospital and, as such, maintains a variety of medical education programs. It has a teaching affiliation with Columbia Presbyterian Medical Center in New York City. In that connection it maintains programs for medical residents, primarily in pediatrics, internal medicine and family practice. It also provides training for surgical residents rotating through Overlook as well as other hospitals. Overlook also conducts a school for x-ray technicians.
Residents and students in the medical education program come and go from the hospital in large class-size groups, essentially concentrated around July 1 of each year. Several different types of housing are provided for staff members of the hospital. It owns Broad Street Apartments, a six-story, 51-unit apartment building which is used primarily for housing of resident physicians.[1] In addition it owns the Glenside Apartments, a 24-unit garden apartment complex housing primarily nurses and several technicians. The balance of the housing units consist of older, detached dwellings which have been renovated and converted into varying numbers of living units. *187 During the years which are the subject of these appeals it provided housing for the following numbers of its various categories of employees:
Medical General Professional
Year Education Nursing Administration Students Services Services Total
1975 75 37 1 18 4 18 153
1976 77 37 1 18 4 18 155
1977 80 39 1 22 4 18 164
1978 104 54 2 20 3 16 199
1979 109 44 3 19 3 11 189
The Overlook medical buildings and a substantial portion of its housing are maintained within a Professional Institution (P.I.) zone created by the City of Summit in 1975. Prior to creation of that zone the hospital had been a nonconforming use in a residential zone. Accordingly, each time the hospital desired to modify a building or change the use of a building, a variance proceeding was required. The hospital proposed the creation of a P.I. zone in order to obviate the need for expensive, time-consuming variance applications and to provide for its projected future growth. It retained a city planner, who submitted to the city a detailed proposal for a P.I. zone, which the hospital and the planner considered to be adequate to meet its long-range needs and to provide for an orderly, well planned growth. However, the zone as enacted by the city encompassed a substantially smaller area than that proposed by the hospital. In effect, the zone adopted by the city recognized the properties owned by the hospital at that time, and provided little room for further expansion. There were seven lots within the entire zone which were not already owned by the hospital at the time the zone was created.
The residential properties here involved are all located outside the P.I. zone. The occupancies of the subject residential properties for the years in question were as follows:
*188 1975 Cases (occupancy as of October 1,1974)
Block Lot Occupant
42 9 Resident physician and family
42 10 2 resident physicians and families
42 11 Resident physician and family
42 12 2 resident physicians and families
43 6 Mechanical maintenance man and family
44 5 Biomedical technician and family
44 8 3 licensed practical nurses (LPNs)
44 9 3 registered nurses (RNs) and 4 LPNs
94 20 Resident physician and family
94 21D Resident physician and family
94 27 17 Rns, 18 LPNs, 1 laboratory technician,
(Glenside Apartments) 1 chief laboratory technician and 1 laboratory section head)
94 27G 2 surgical residents
1976 Cases (occupancy as of October 1,1975)
42 14A Resident physician and family
42 6 Resident physician and family
1978 Cases (occupancy as of October 1,1977)
Block Lot Occupant
42 14A Surgical students - varying numbers
44 6 Resident physician and family
44 6A 2 RNs
44 7 2 resident physicians and families
44 12 4 x-ray technology students and 1 RN
1979 Cases (occupancy as of October 1,1978)
42 8 1 resident physician and family and
1 x-ray technology student and family
42 14A • Surgical students - varying numbers
44 6 Resident physician and family
44 6A 2 RNs
44 7 2 resident physicians
44 12 2 RNs and 4 x-ray technology students
*189 There is no dispute as to the fact that all of the above-listed properties consisted of buildings together with land not exceeding five acres.
The residential rental market in Summit and the surrounding towns within a 30-minute commuting distance from the hospital is extremely limited. The vacancy rate of all rental property in that area is very low. In addition, the housing which does become available is very expensive and is rented almost immediately when it comes on the market. Furthermore, it does not become available in the volume necessary to meet staff turnovers as they occur. There was, therefore, very little housing available to meet the needs of hospital employees at the time when the housing was needed.
The properties which are the subject of these appeals were rented by the hospital at rates below market rentals for comparable properties in Summit and the surrounding towns.
Overlook has determined that in order to provide for emergency staffing it is essential to have employees housed nearby. The same would also apply in the event of a weather or transportation emergency. Further, as the modern practice of medicine is essentially a “team” function, the said team consists of a variety of medical, paramedical, technical and support personnel. Without all members of the team available in the event of an emergency, proper medical care can be jeopardized. The hospital has also concluded that housing is essential for the recruitment of staff members, particularly resident doctors, nurses and students. These personnel cannot be attracted to the hospital without the assurance that adequate, reasonably priced housing is available. Also, it determined that the housing is an essential element in its residency program conducted in affiliation with Columbia Presbyterian Medical Center in New York City. Those residents arrive each year on or about July 1. Housing for that substantial number of residents and their families must be available on those dates. The private housing market was inadequate to supply this very specific need.
*190 Block 94, Lots 23 and 26, are small vacant lots which previously contained tax-exempt dwelling units. They were consolidated by a deed recorded August 8, 1978, with a larger property containing a parking lot for hospital employees and the Glenside Apartments. As of October 1, 1978 the lots were being utilized as a buffer zone for the parking area used by hospital employees. The dedication of those lots as a buffer zone was done in order to voluntarily comply with the city’s zoning ordinance, which was enacted after construction of the parking lot and which, technically, did not apply to the lot.
N.J.S.A. 54:4-3.6 provides an exemption from real property taxes for “all buildings actually and exclusively used in the work of associations and corporations organized exclusively . . . for ... hospital purposes.... ” This exemption also extends to “the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed 5 acres in extent.”
It is well settled “that tax exemptions are not favored and that the burden of proving tax exempt status is upon the claimant since all property in the State is required to bear its equal share of the public taxation burden.” Locustwood Cem. Ass’n v. Cherry Hill Tp., 133 N.J.Super. 92, 96, 335 A.2d 571 (App.Div.1975); see, also, Bloomfield v. Academy of Med. of New Jersey, 47 N.J. 358, 221 A.2d 15 (1966). The court in the case of In re Kuebler, 106 N.J.Super. 13, 254 A.2d 115 (App.Div. 1969), stated that
... we note at the outset that statutes granting exemption from taxation are strictly construed and doubts as to the eligibility for exemption are resolved against the claimant. “[A] claimed exemption from taxation must find support in clear and unmistakable expressions of the legislative act.” Hopkins v. Neeld, 41 NJ.Super. 345, 351 [125 A.2d 153] (App.Div.1956). On the other hand, “strict construction does not mean a construction which begrudges. Rather it means an exemption shall not be extended beyond the ascertainable intention of the Legislature and hence an exemption must be denied if a purpose to grant it is doubtful.” Deubel v. Kervick, 33 N.J. 568, 574 [166 A.2d 561] (1960)....
*191 The court in Princeton Tp. v. Tenacre Foundation, 69 N.J.Super. 559, 174 A.2d 601 (App.Div.1961), discussed the interpretation of legislative enactments as follows:
... However, the basic inquiry always is the legislative intent as expressed in the statute. To that end the construction, while strict, must always be reasonable, and words are not to be given a rigid scholastic interpretation when it appears that they were used in another sense. The rule of strict construction must never be allowed to defeat the evident legislative design, [at 563,174 A.2d 601; citation omitted]
Hence, the legislative design is of utmost importance in determining whether the subject properties are tax exempt.
City’s basic contention is that the properties in question were not actually and exclusively used for hospital purposes since the extent to which housing was supplied was not “reasonably necessary” to the efficient functioning of the hospital. The test of whether said use was “reasonably necessary” for such purposes was detailed in Long Branch v. Monmouth Medical Center, 138 N.J.Super. 524, 532, 351 A.2d 756 (App.Div.1976), aff’d 73 N.J. 179, 373 A.2d 651 (1977). That court placed great reliance on Cedars of Lebanon Hosp. v. Los Angeles Cty., 35 Cal. 2d 729, 221 P.2d 31 (Sup.Ct.1950), which was quoted as follows:
It thus appears that under the rule of strict but reasonable construction, the phrase “property used exclusively for ... hospital . . purposes” should be held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of hospital purposes; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern hospital. This test is fully supported by reason and the weight of authority.... [221 P. 2d at 35]
Relying in large part on the principles expressed in the Cedars case, the court in the Long Branch case went on to state:
... The furnishing of housing facilities to resident physicians, interns and nurses on the hospital staff is reasonably necessary for the proper and efficient operation of the hospital. It cannot be seriously disputed that the operation of a large general hospital, such as the Center, requires the presence of properly qualified resident physicians, interns and nurses. The evidence established that the substantially lower rentals charged by the Center to the resident physicians, interns and nurses served as a subsidy to attract qualified people to its staff. Furthermore, it is obvious that by providing housing facilities for its resident physicians, interns and nurses in or near the hospital, the Center is better able to *192 function properly and efficiently on a 24-hour basis. The landlord-tenant relationship existing between the Center and the resident physicians, interns and nurses renting the apartments is secondary to the primary purpose of providing housing for such needed personnel. Furthermore, the Center did not operate the building at a profit. Cf. Pingry Corp. v. Hillside Tp., supra [46 N.J. 457, 217 A. 2d 868]. In these circumstances, we hold that the Borden apartments are an integral part of the Center’s facilities and “actually and exclusively used” to carry out its hospital purposes. Cf. Princeton Tp. v. Tenacre Foundation, supra 69 N.J.Super. at 565 [174 A.2d 601] [138 N.J.Super. at 533, 351 A.2d 756]
This case, as to housing supplied to resident physicians, surgical students and nurses, both registered and licensed practical, is directly controlled by the Long Branch case. See, also, Perth Amboy General Hosp. v. Perth Amboy, 176 N.J.Super. 307, 422 A.2d 1331 (App.Div.1980). Further, consideration must be given to the great reliance placed on Cedars of Lebanon Hosp. v. Los Angeles Cty., supra, by the Long Branch court. Cedars not only recognized the common practice of hospitals to provide living accommodations to student nurses as well as working nurses, it also accepted the principle that the same consideration would apply to housing accommodations furnished to superintendents and other members of the hospital staff. These latter categories, however, require specific justification in order to meet the statutory test as judicially interpreted.
The properties under review show that, in addition to resident physicians, surgical students and nurses, housing was also supplied to a mechanical maintenance man, a biomedical technician, three laboratory technicians and eight x-ray technology students.
It is obvious that a biomedical technician as well as laboratory technicians fill a vital role in the medical care offered by a hospital. As the Director of the subject hospital testified, it is not just doctors or nurses who care for patients, because a technician’s gas blood analysis could determine an oxygen deficiency or some other problem relating to patient care. That same reasoning would apply to the biomedical technician whose skill was in electronic equipment used for coronary care.
*193 The x-ray technology students are being trained for an important component of health care. The teaching role of a hospital is equally fulfilled in conducting an x-ray technology school as it is in conducting a nursing school. Housing for nursing school students has been an historical attribute of such programs. There is no reason to treat student housing for these two medical training facilities in a different manner.
The mechanical maintenance man presents a different problem. The testimony was that he was the only particular employee skilled in hydraulics and that the heating, air conditioning and ventilation systems were all hydraulic. Further, the testimony was that he was on call 24 hours a day. However, the facts also show that the hospital’s chief engineer was also housed on hospital-owned property which is not here at issue. As previously stated, housing for nonmedical support personnel requires specific justification in order that their housing be considered to be an integral part of a hospital’s facilities and actually and exclusively used to advance its hospital purposes. Long Branch v. Monmouth Medical Center, supra. Where housing for a chief engineer has been so integrated into the hospital complex, it is difficult to conclude that a subordinate medical maintenance man’s housing is also reasonable and necessary. It must be recognized that there is a distinction between the test of “reasonable and necessary” employment and “reasonable and necessary” integration of an employee’s housing into the hospital complex. Accordingly, it is concluded that the mechanical maintenance man’s housing does not qualify for exemption.
Having concluded that the personnel occupying the hospital owned housing were an integral part of its emergency care or educational operations, the question remains as to whether the extent of the hospital’s practice adversely impacted on some of the subject properties.
This court can see no justification to limit housing for nurses, resident physicians and surgical students. As pointed out in the *194 Long Branch and Cedars of Lebanon Hospital cases, housing for these categories has been an established practice. The same should apply to x-ray technology students. The role which technicians play in hospital services also requires a finding that they should be placed in the same category as nurses. I cannot find any abuse in the utilization of the subject properties.
The city has implicitly recognized the hospital’s needs and the common practice of hospitals by not questioning those properties used for housing located within the P.I. zone. That zoning barrier is not a basis upon which qualification for exemption under N.J.S.A. 54:4-3.6 can be denied.
Lots 23 and 26 in Block 94 were used as a buffer zone for the hospital’s parking lot as of October 1, 1978. Property must be assessed in the form in which it is held by the taxpayer as of the assessing date. Newark v. West Milford Tp., 9 N.J. 295, 303, 88 A.2d 211 (1952). The validity of extending a local property tax exemption to properties used as buffers, including after acquired land, has been recognized by our courts. Bergen Cty. v. Paramus, 79 N.J. 302, 399 A.2d 616 (1979); Moonachie v. Port of New York Auth., 38 N.J. 414, 185 A.2d 207 (1962); Boys Club of Clifton, Inc., v. Jefferson Tp., 72 N.J. 389, 371 A.2d 22 (1977). Since there is no dispute that the lots were being used as a buffer zone to the hospital parking lot, they are also exempt.
The Clerk of the Tax Court is directed to enter judgments granting exemption to all the properties here involved except Block 43, Lot 6, for 1975, because that was occupied by a maintenance man.

As used herein, a resident physician is a medical graduate engaged full-time in hospital work and study leading to a specialization in medicine.