THE BOROUGH OF MOONACHIE, PLAINTIFF-RESPONDENT,
v. THE PORT OF NEW YORK AUTHORITY, DEFENDANT-
APPELLANT, AND COUNTY OF BERGEN, DEFENDANT-
RESPONDENT.

Argued September 24, 1962—Decided November 5, 1962.

Mr. *Francis A. Mulhern* argued the cause for defendant-appellant (*Mr. Sidney Goldstein* of the New York Bar, of counsel).

Mr. *Charles L. Bertini* argued the cause for plaintiff-respondent (*Mr. Thomas J. Ryan,* of counsel and on the brief).

Mr. *Milton T. Lasher* argued the cause for defendant-respondent.

The opinion of the court was delivered by

FRANCIS, J. In this proceeding the Borough of Moonachie sought a judgment declaring that a building on a tract of land owned by the Port Authority and acquired by it as part of the Teterboro Airport complex is not exempt from taxation. The County of Bergen asked that the land as well as the building be adjudged taxable. The Port Authority denied that either land or building is taxable and also claimed for reasons to be discussed that the borough and county are estopped from imposing an assessment for such purpose. The Law Division of the Superior Court declared both land and building subject to taxation. Port Authority's subsequent appeal to the Appellate Division was certified on our own motion for determination by this court.

The Port of New York Authority is a public corporate entity, an arm of the States of New York and New Jersey, created in 1921 by compact between them for the purpose of coordination and development of terminal, transportation and other facilities of commerce in and about the Port of New York. *R. S.* 32:1-1 *et seq.* In 1947 the Legislatures of both States adopted the air terminal statute empowering the Authority "to effectuate, establish, acquire, construct, rehabilitate, improve, maintain and operate air terminals, *as hereafter defined,* within the Port of New York district."

*L.* 1947, *c.* 43, *N. J. S. A.* 32:1–35.1 *et seq.; N. Y. L.* 1947, *c.* 802, *McKinney's Unconsolidated Laws,* §§ 6631–6647. (Emphasis ours.) Power was given also to acquire real property for "air terminal purposes" by condemnation or eminent domain. *N. J. S. A.* 32:1–35.9. The conduct of air terminals was assimilated into the unitary financial operation of existing Port Authority facilities. *N. J. S. A.* 32:1–35.6, 35.12.

In 1949 pursuant to these powers and to *L.* 1949, *c.* 81, *N. J. S. A.* 32:1–35.18, the Teterboro Airport was acquired. It is located in the Boroughs of Teterboro, Moonachie and Hasbrouck Heights, Bergen County, New Jersey and at the time of acquisition consisted of 450 acres. Thereafter it was expanded gradually to its present size of about 900 acres. The entire southerly boundary of the airport property is Moonachie Avenue. About one-quarter of this boundary is reserved as an approach area to certain runways; the remaining three-quarters of the boundary, except for the 10-acre tract involved in this proceeding, is vacant land. Below is a simplified map of the location. The dotted areas at the

upper left portion of the westerly side of the airport and the two smaller such areas at the lower left portion of the south and southeast side are clear zones required to be maintained at the ends of the runways. The remaining undotted area is vacant land except, as has been indicated, for the 10-acre tract, here involved, along the Moonachie Avenue boundary of the airport at the upper left corner of the map and marked "*J. Screen and Storm Window Co. Building." There is no doubt that this undotted area, acquisition of which was completed in 1952, was initially purchased for airport purposes. It was to provide noise protection for people living south of the airport; also adequate space within the airport for such runway extensions or changes as the future might require, or for any new or additional air navigation aids that might be ordered. It is still being devoted to those purposes.

In February 1959 after the undotted southerly portion of the airport had remained vacant for about seven years, the Port Authority entered into a 20-year lease of the 10-acre tract shown on the map with Jersey Screen and Storm Window Co., Inc. As part of the undertaking, the Port Authority agreed to construct on the land a single story building to be used for the "design, manufacture and sale of metal windows, metal doors, metal siding, metal awnings, metal railings, metal building panels and any and all other metal building accessories, together with any component parts and any and all other allied products of the foregoing; and for the extrusion, casting, anodizing and other similar finishing of metal products"; for business and administration offices of the company, and "for no other purpose whatsoever." The one-story building was to be within the height limit imposed by the Federal Aviation Agency for structures in such proximity to flight paths.

Before making the lease, the Authority made a "business judgment" that it was not necessary to keep the land in its unimproved state and that it would not be needed for any airport structure or air navigational aids for at least 12

years. As part of this opinion also, it was concluded that the lease would probably continue in force for the full 20-year term. A rental was fixed which would provide a return on the investment and amortize it as well in 12 to 14 years. Presumably as a precautionary measure, however, the lease provided that it could be terminated on 365 days' notice effective at any time subsequent to the end of the fifth year of the term "if in the sole discretion of the Porth Authority the premises or any portion thereof are required for, or in connection with, air terminal operation or development inconsistent with the continued existence of the improvements described in Exhibit C." (That exhibit is the construction plan.) In that event the "Port Authority shall be obligated subsequent to such termination to demolish the said improvements." Construction of the building was begun in June 1959 and completed in June 1960. According to the Port Authority Executive Director, the cost was "a little over a million dollars." Under the lease the tenant is required to pay an annual rental of $110,390.

The borough assessors being of the opinion that the building was neither an air terminal nor being used for air terminal purposes within the statutory definition, *N. J. S. A.* 32:1–35.3, assessed it on a *pro rata* basis for 1960 at $269,370, and at $309,300 (representing one-third of the true value) for the full year 1961. The tax levy for 1960 was $10,441.08 and for 1961, $21,248.91. The Authority claimed that the land and building were within the statutory category, and so were exempt from taxation under *N. J. S. A.* 32:1–35.5. On the evidence adduced, the trial court found that the exemption was not applicable to either land or building and declared both taxable.

Section 5 of the Air Terminal Act, *L.* 1947, *c.* 43, *N. J. S. A.* 32:1–35.5 provides:

"The Port Authority shall be required to pay no taxes or assessments upon any of the property acquired or used by it *for air terminal purposes*; but this shall not be construed to prevent the Port Authority and municipalities from entering into agreements for the

payment of fair and reasonable sums by the Port Authority annually in accordance with legislation heretofore adopted by the two States, to the end that such municipalities may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property by the Port Authority *for air terminal purposes.*" (Emphasis added.)

The complementary New York statute appears in *McKinney's Unconsolidated Laws,* § 6635.

The antecedent legislation referred to is *L.* 1931, *c.* 69, § 1, *R. S.* 32:1–144; *N. Y. L.* 1931, *c.* 553, *McKinney's, supra,* § 6971, which authorizes the Authority "in its discretion" to enter into "voluntary agreements" with the interested municipality or county to pay annually a fair and reasonable sum in lieu of taxes on any marine or inland terminal property owned by it. The payment is "not [to be] in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the port authority."

The tax immunity is limited to property acquired or used for air terminal purposes. Obviously in this case if the land or building or both were not acquired or used for such purposes, the exemption is not applicable. The same qualification must be regarded as controlling the in lieu of taxes agreements. If the acquisition or use was or is not for the specified object, a municipality or county would lack authority to make such an agreement or accept payment under it. In such case the property would have to bear a share of the tax burden equal to that of the ordinary citizen-owner. Any discrimination in that respect would be illegal.

After the acquisition of the ten acres of vacant land involved in this proceeding, the Authority, Moonachie and Bergen County executed annually renewable in lieu of taxes agreements. The Moonachie-Authority expiration date is December 31, 1963; the County-Authority compact provides for automatic annual renewal for "an unlimited period of successive years" until the authorizing resolution is modified or repealed by action of the Board of Freeholders. The taxes on the lots which constituted the 10-acre tract when

purchased by the Authority were $423.77 annually. The amounts due under the in lieu agreements on these lots were paid up to and including 1960. Presumably the cessation of payments was brought about by this litigation. As we have said, the binding character of the agreements depends upon resolution of the Authority's claims of tax exemption.

Thus, we come to the basic issues: Was this 10-acre tract or the building later put on it acquired or are both or either used for air terminal purposes? The answer must be found in the statute which specifically defines the controlling terms. "Air terminals" shall mean:

"developments,

consisting of runways, hangars, control towers, ramps, wharves, bulkheads, buildings, structures, parking areas, improvements, facilities or other real property

necessary, convenient or desirable

for

the loading, taking off, accommodation and servicing of aircraft of all types * * *, or

for

the loading, unloading, interchange or transfer of * * * passengers or their baggage, or such cargo, or otherwise

for

the accommodation, use or convenience of such passengers, or such carriers or their employees (facilities and accommodations at sites removed from landing fields and other landing areas, however, to be limited to ticket stations and passenger stations for air passengers, to express and freight stations for air express and air freight, and to beacons and other aids to air navigation), or

for

the landing, taking off, accommodation and servicing of aircraft owned or operated by persons other than carriers." *N. J. S. A.* 32:1–35.3.

"Air terminal purposes" shall mean:

"the effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance or *operation of air terminals* owned, leased or operated by the Port of New York Authority (including airports operated under revocable permits) or operated by others pursuant to agreements with the Port Authority." *Id.* (Emphasis added.)

In 1949 the Authority was given specific power to acquire real property by condemnation or eminent domain for the enlargement or improvement of the "air terminal known as Teterboro Airport." This act repeated the definitions of air terminal and air terminal purposes as set forth above. *L.* 1949, *c.* 81, *N. J. S. A.* 32:1–35.18.

It requires no deep study to reach the conclusion that a metal screen manufacturing plant is not an air terminal and that a building so employed is not being used for air terminal purposes within the legislative meaning of those terms. No one seriously contends otherwise. The position of the Authority is this: The air terminal law when adopted was declared by the Legislatures of New York and New Jersey to be in furtherance of their policy of recognizing the furnishing of proper and adequate air terminal facilities as a regional and interstate problem, and of encouraging the integration of air terminals within the Port district as far as practicable in a unified system. They declared also that the enactment was in partial effectuation of the "Comprehensive Plan, heretofore adopted by the two States for the development of terminal and transportation facilities in the Port of New York District." Accordingly, they ordained that the Authority "shall be authorized to effectuate, establish, acquire, construct, rehabilitate, improve, maintain and operate air terminals, *as hereafter defined * * *.*" *N. J. S. A.* 32:1–35.1. (Emphasis added.) The Comprehensive Plan referred to is that approved by the two States in 1922, *L.* 1922, *c.* 9, *R. S.* 32:1–25 *et seq.; N. Y. L.* 1922, *c.* 43, *McKinney's, supra,* § 6451 *et seq.,* for the development of the terminal, transportation and other facilities

of commerce in the Port of New York. Among other things, it "authorized and directed" the Authority to proceed with the development of the Port in accordance therewith "as rapidly as may be economically practicable" and it vested the Authority "with all necessary and appropriate powers not inconsistent with the constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments." *R. S.* 32:1–33. Continuing its explanation, the Authority points out that although the revenues from its overall projects are more than adequate to meet operation requirements, the income from Teterboro Airport has not been, and is not now, sufficient to make it self-sustaining. From these premises, the argument is made that since authorization exists to develop air terminals as rapidly as may be economically possible, implied or incidental authority exists to erect a building on airport land primarily or solely for revenue-producing purposes and lease it for a business or manufacturing activity wholly unrelated to the legislatively specified air terminal purposes.

Counsel for the Authority stresses the thesis that the ultimate objective is self-sufficient operation of individual units of the Port development complex and that accomplishment of the end justifies an independent enterprise, such as is pursued here, in order to offset the inadequate income of a particular air terminal. The Executive Director in his testimony took a broader view of his principal's power. His position is that even if all units were self-sustaining and showing an excess of revenue over costs, so long as the tract of land involved is held legitimately for air terminal purposes, it is within the ambit of the Authority's power to erect thereon a structure to house a wholly foreign business enterprise and to lease it solely for revenue purposes. As we see the issue the same principle is involved and the result the same so far as the right to *tax immunity is concerned.* The right to that immunity depends upon two factors. First, it must be measured by the boundaries of the authority delegated by the Legislature to the agency to operate in

the specified public activity. And second, it is limited by the terms in which the Legislature bestowed the immunity. No question has been raised here with respect to power to devote the building to the purpose described in the lease. The sole problem is whether such use is within the tax exemption granted by *N. J. S. A.* 32:1–35.5.

All real property in this State not expressly exempted is subject to taxation. *N. J. S. A.* 54:4–1. For example, property acquired by a municipality through tax title foreclosure is taxable if used for private purposes. *N. J. S. A.* 54:4–3.3. The same is true of property of public agencies which is not used for the authorized public purpose or held for such expected use within a reasonable time. *New Jersey Turnpike Authority v. Washington Township,* 16 *N. J.* 38, 44 (1954); *N. J. S. A.* 54:4–63.26. Traditionally the property tax has been the chief source of revenue of local governments. Recent times have witnessed efforts on the part of state legislatures to relieve somewhat the almost exclusive dependence upon that single source of revenue. But even in those jurisdictions, property taxation still represents the mainstay of local government. Recent years have witnessed also a steadily increasing taking of private property by both state and federal governments and various agencies thereof for public purposes, thus removing it from the tax rolls and casting a proportionately greater share of support of state and local government upon the private property owner. The value for assessment purposes in 1962 of all types of real property specifically exempt from taxation in New Jersey has been calculated at over 2.5 billion dollars. See, *Certification of the State Abstract of Ratables* for 1962, Division of Taxation, July 18, 1962; *Financial Statistics of New Jersey Local Government* (New Jersey Taxpayers Association, September 1962) 44. Exemption of industrial property from taxation or its removal from tax rolls causes a particularly severe impact upon local government. Such property is a vital part of the tax base in most communities since the tax revenue derived from it, as distinguished from

residential property, usually greatly exceeds the cost of providing local public services. And it may be said that there are no substantial differences, either in the nature of their activity or in the economic effects upon local communities, between privately owned industrial plants, and buildings owned by the Port Authority and leased for industrial operations unrelated to air terminal purposes.

Moreover, when a public agency undertakes to lease a building owned by it for a purpose foreign to its statutorily described public function, it engages in competition for tenants with private owners who may be pursuing the same objective. Recognizing this fact, the Authority has informed us that the rents required of its lessees are kept comparable to those imposed by the private owner. To do this an estimate is made of the local taxes that would be assessed against the building to be leased if owned privately. Then the other factors which go into the determination of rental value are added and the product is the sum fixed as rent. In this instance, according to the Executive Director, it was estimated that the taxes on the building would amount to $17,300 annually, and that sum was included in the rent. Upon collection as part of the rent it went into the Authority treasury. Thus, although claiming exemption itself, in effect it assessed and collected Moonachie's taxes on the building and retained them for itself.

The considerations noted underline the duty of the court in this controversy. They emphasize our obligation to be satisfied that the Legislature intended to bestow a tax exemption of the dimensions and character claimed.

As we have said above, the manufacture of metal windows, doors and the like clearly is not an air terminal purpose within the statutory definition. Nor is the building when built for and devoted to such use an air terminal facility within that definition. The Authority contends, however, that the land which beyond question was acquired for airport use is still being used for that purpose and should not be considered apart from the building erected thereon. The

land (it argues) having been bought as part of a buffer area or for anticipated expansion or future installation of air navigational aids, continues to serve those ends, and since the building with its limited height does not interfere with air travel or the indicated use of the land, both should be considered as an integrated unit, with the building, chameleon-like, taking on the character of the land as an air terminal facility. And it argues no matter what the use of the building, so long as it rests on such land and produces revenue in aid of the airport operation (or even the overall operation of all Authority projects, according to the Executive Director), it is incidental to the conduct of an air terminal and so qualifies for tax exemption.

The contention is predicated principally on *Bush Terminal Co. v. City of New York,* 282 *N. Y.* 306, 26 *N. E.* 2d 269 (*Ct. App.* 1940). Since the Authority is an instrumentality of New York and New Jersey, it is eminently desirable, of course, that the path of judicial decision in the courts of the two States be a common one. Consequently, if the cited case were specifically in point we would regard it as a highly influential precedent. Our study of the opinion, conditioned by the indicated approach, leads us to accept its basic principle, even though we find the factual framework different in decisive aspects from the situation before us.

In *Bush* the Port Authority had acquired title to an entire square block of land in downtown New York City. Thereafter, it agreed with eight trunk line railroads entering the Port of New York to build an inland terminal building and to lease to them the basement and portions of the ground floor to be used as a terminal station in connection with the transportation, assemblage and distribution of less-than-carload freight. The proof submitted made it obvious that such a terminal was a highly desirable and useful facility for the Port area. There was no question about its establishment's being within the agency's statutory authorization. It appeared, however, that erection and maintenance of a structure limited to the housing of the freight terminal

alone would be economically impossible. Moreover, the record showed that prior to construction of the building in question, the Legislatures and the Governors of New York and New Jersey had been informed by the annual reports of the Authority of the plan to add additional floors to be rented out for office, loft and manufacturing purposes, and, according to the Court of Appeals opinion, the Governors and Legislatures manifested approval.

Against this background the Authority constructed a 16-story building, the upper 14 floors of which were to be offered to the public for rent for general business purposes. The tax-exempt status of the building was challenged by Bush Terminal Company and other taxpayers. The trial court found, and the Court of Appeals agreed, that without the additional stories the Port Authority "would have been unable to borrow the funds needed to finance the erection [of the terminal]; and consequently would have been wholly unable to carry out and effectuate the mandate" of the Compact and Comprehensive Plan for the development of the Port district. In sustaining the tax immunity the court said:

"The construction of a great building, over the space used for the freight terminal, in order to obtain revenue, might transcend the powers of the Authority if the erection of the freight terminal alone would have been feasible, but the mandate and the express grant of power to the Port Authority to construct terminals include as an incident the power to use appropriate means to carry out the mandate. Acts performed in carrying out a legislative mandate, as an incident to the exercise of a general power conferred by the Legislature, are not ultra vires where they were within the contemplation of the Legislature when it granted the general power." 26 N. E. 2d, at p. 273.

The true significance of the case cannot be evaluated apart from the peculiar facts which justified and made necessary its result. The basic principle to be extracted from the decision, and which we accept, is that property owned by a public agency but employed *primarily* to obtain revenue or profit through private business uses is not immune from taxation,

but property employed primarily for a public use does not lose immunity because the agency *incidentally* derives some private business income from it. See also, *City of Toledo v. Jenkins,* 143 *Ohio St.* 141, 54 *N. E.* 2d 656 (*Sup. Ct.* 1944); *Wentz v. City of Philadelphia,* 301 *Pa.* 261, 151 *A.* 883 (*Sup. Ct.* 1930); and compare generally *New Jersey Turnpike Authority v. Washington Township, supra;* Annotation, 101 *A. L. R.* 787, 791–92 (1936). Stated more precisely for present purposes, a tax exemption based upon a statute specifying a particular public use is clearly lost when the use to which the property is put is foreign to the prescribed use and the revenue motive in adopting the use is the primary or exclusive one.

The *Bush* doctrine was still in full force and effect in 1947 when the Air Terminal Acts were adopted. It had not been altered by case law or legislation in either State. The fact holds added significance because the New York Court of Appeals had pointed out to both Legislatures that by utilizing plain and appropriate language whatever exemption they wished to grant in connection with Port Authority operations could easily be spelled out. Against that backdrop the specific definitions of "air terminals" and "air terminal purposes" were made part of the 1947 enactments and the tax exemption was restricted to "property acquired or used * * * for air terminal purposes." In our judgment no reasonable interpretation, however liberal, can bring the building in question, which was acquired and is being used under the lease as a metal window, metal doors, etc. manufacturing plant, within the scope of those definitions. And when the principle of *Bush* is added, because the motive in engaging in the unrelated enterprise was primarily or exclusively revenue, we can find no justification for holding the building to be exempt as having been acquired or used for airport purposes. In such circumstances when the Port Authority entered the market place in search of a tenant for its *building,* it did so in competition with, and on the same footing as, a private property owner, and must be re-

quired to assume an equal share of the general tax burden with him. If the scope of the exemption from that burden is to be enlarged, it is for the Legislature to do so; the courts are without authority to bestow or to enlarge the privilege.

So far as the land is concerned, the situation is different. We are not dealing with an excess acquisition nor land which is no longer needed for airport purposes. *New Jersey Turnpike Authority v. Washington Township, supra.* (16 *N. J.,* at *p.* 44.) The 10-acre tract is still serving the original objective and the one-story building thereon does not interfere with that objective. As a consequence the land has continued to meet the statutory design and qualifies for tax exemption. Thus, the Law Division erroneously held it to be assessable.

The land, being within the exempt class, may properly be the subject of an in lieu of taxes agreement. Accordingly, the Authority is correct in treating its agreements with Moonachie and Bergen County as binding. But, here, only land or a building, eligible for tax exemption under *N. J. S. A.* 32:1–35.5 can be covered by an in lieu agreement. The municipality and the county are creatures of delegated powers and must act within the legislatively imposed limitations. These public bodies are required to distribute the cost of government equally among property owners who are not the beneficiaries of some exemption. Acceptance by them of an in lieu agreement for a building which was not being used for air terminal purposes would give an unauthorized advantage to the taxpayer involved, and so exceed the boundaries of their power. In the present case another factor—although not a decisive one in passing upon the binding character of the in lieu agreement—should be recalled. The building in question was not in existence, and apparently not even in contemplation, when the contract was made. Certainly on the record it cannot be said that the borough and the county contemplated binding themselves to recognition of the tax-exempt status of a building to be

constructed in the future solely for revenue-producing purposes and to be put to a use which would not qualify for exemption. On the facts present the borough and the county not only could not, but clearly never intended to bind themselves to treat the manufacturing plant as tax-immune. Nor can it be said that they intended to accept payment of the taxes, previously imposed on the land alone, in lieu of future taxes in an unknown amount on a structure which when built would not be entitled to exemption.

For the reasons expressed, the action of the trial court in sustaining the land assessment is reversed and that declaring the building nonexempt is affirmed. The judgment is modified accordingly.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.