748 A.2d 128 (2000)
329 N.J. Super. 410
TOWNSHIP OF HOLMDEL, Plaintiff-Appellant,
v.
NEW JERSEY HIGHWAY AUTHORITY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 2000.
Decided April 3, 2000.
*129 Frederick W. Rose, Summit, for plaintiff-appellant (Cooper, Rose & English, attorneys; Mr. Rose and Bruce S. Goodman, on the brief).
Jonathan L. Williams, Teaneck, for defendant-respondent (DeCotiis, Fitzpatrick & Gluck, attorneys; Mr. Williams, of counsel; Lisa E. Halperin, on the brief).
Before Judges PETRELLA, CONLEY and COBURN.
The opinion of the court was delivered by, CONLEY, J.A.D.
This appeal raises the question of whether those portions of the New Jersey Highway Authority's Garden State Arts Center complex subject to a twenty-one year "privatization" lease with GSAC Partners (GSAC) and to a biennial automatically renewable lease with 116 Park Caterers, have lost their prior immunity from local property taxes. The Tax Court determined they had not. In doing so, we are convinced the judge used an incorrect analysis of the issues and too broadly defined the boundaries of that tax immunity. We remand for further development of the record and for reconsideration.

I.
The New Jersey Highway Authority Act (Act), N.J.S.A. 27:12B-1 to -35, was enacted in 1952. The Act created the New Jersey Highway Authority (Authority). "In order to facilitate vehicular traffic and remove the present handicaps and hazards on the congested highways in the State, and to provide for the construction of modern express highways embodying every known safety device," N.J.S.A. 27:12B-2 (emphasis added), the Authority was empowered to "acquire, construct, maintain, improve, repair and operate highway projects...." Ibid. (emphasis added). In the performance of its statutorily conferred powers the Authority is "an instrumentality exercising public and essential governmental functions." N.J.S.A. 27:12B-4. "[T]he exercise by the authority of the powers conferred by [the] act in the construction, operation and maintenance of projects," as defined in the Act, is "deemed and held to be an essential governmental function of the State...." Ibid. Among the things that the Authority may do with respect to projects that it implements for the purposes of the Act is to "make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers...." N.J.S.A. 27:12B-5(o). And see N.J.S.A. 27:12B-14 (authorizing, among other things, the authority to contract with others "desiring the use of any part [of a statutorily authorized project]... for ... stores, hotels, and restaurants, or for any other purpose except for tracks for railroad or railway use....").
*130 As defined in the Act, prior to 1968, "project" was "any express highway, superhighway, or motorway ... together with such adjoining park or recreational areas and facilities as the Authority ... shall find to be necessary and desirable to promote the public health and welfare ...." N.J.S.A. 27:12B-3(d) (emphasis added). This would seem to establish rather broad boundaries for the Authority's engagement in activities and projects on properties it owns and which adjoin the roadways it operates. And see N.J.S.A. 27:12B-14. We take note, however, of the introductory statement to the Act which, in 1952, expressed the Act's primary objective as "[a]n [a]ct to facilitate vehicular traffic in the State of New Jersey by providing for the acquisition, construction, maintenance, repair and operation of highway projects." L. 1952, c. 16 (emphasis added). See also N.J.S.A. 27:12B-2.

II.
Pursuant to its enabling powers, the Authority owns and operates the Garden State Parkway (Parkway). Sometime prior to 1968, it acquired 400 acres adjacent to the Parkway in Holmdel Township. That property is described by the Authority in the stipulated facts submitted to the Tax Court[1] as "the Arts Center complex, a 400-acre park containing nature trails, fitness courses, the New Jersey Vietnam Veterans Memorial, the offices of the Garden State Arts Center Foundation, and Garden State Cultural Fund, the New Jersey Highway Authority Maintenance Department, the amphitheater and related operation facilities, Celebrity House, and the Robert B. Meyner Reception Center." As further described by the Authority, the Arts Center complex "offer[s] park and recreation uses, along with concerts and other entertainment."
This may in general be an accurate description of the use of most of the facilities and activities at the Arts Center complex. But as far as the record reflects, the operation of the Robert B. Meyner Reception Center (Reception Center) under the lease with 116 Park Caterers is of a somewhat different category. Under that lease, the Reception Center is used for private receptions, banquets, meetings, conferences, luncheons, dinners, weddings and the like. Its intended use, as depicted in the 116 Park Caterers lease is as a "first-class high quality restaurant, catering, banquet and conference facility."
We pause at this point to make clear that not all components of the Arts Center complex are the subject of this appeal. Holmdel does not seek to impose local property taxes upon the following, as depicted in the parties' stipulated facts:
(a) The New Jersey Viet Nam Veterans' Memorial ... and associated areas located to the southeast of the Arts Center building;
(b) The Telegraph Hill Nature Area and related picnic areas ... located to the northwest of the Arts Center building;
(c) The New Jersey Highway Authority Maintenance Department building and yard ... located to the southwest of the Arts Center building and to the west of the Parkway itself; and
(d) The facilities for the State Police Troop ... assigned to the Parkway located to the southwest of the Arts Center building and to the west of the Parkway itself.
It does seek to impose local property taxes upon the following components, as depicted in the parties' stipulated facts:
(a) The Arts Center building ... a roofed, open-air amphitheater which at present can accommodate an audience of over 17,500 in covered seating and on *131 the adjoining lawn, together with adjacent ticket booths and refreshment stands;
(b) The Robert B. Meyner Reception Center ... located to the southeast of the Arts Center building;
(c) The Celebrity House ... located to the southeast of the Reception Center;
(d) The Large Main Parking Area ... located to the southwest of the Arts Center building;
(e) The North overflow parking area... located to the north of the Arts Center building and to the east of the Parkway itself;
(f) The South overflow parking area... located to the southwest of the Arts Center building and to the west of the Parkway itself;
(g) The newly-constructed additional parking lots which have been built;
(h) Two large electronically-controlled billboards ..., one facing the northbound lanes of the Parkway and one facing the southbound lanes of the Parkway;[2]
(i) Various interconnecting roadways to accommodate traffic flow to and from the Main Parking, North Parking and additional parking facilities for those attending performances at the Arts Center building and events at the Reception Center and/or visits to the Guest House; and
(j) All land adjoining the foregoing which is beyond the established right-of-way of the Parkway, subject to [certain] exclusions....
When we hereinafter refer to the Arts Center complex we limit our reference to the components that we have just listed which Holmdel seeks to tax.
The triggering event that prompted Holmdel, after years of the Authority's untaxed operation of the Arts Center complex, to attempt to impose local property taxes was the 1997 lease entered into with GSAC, effective as of May 1996. As to that lease, the stipulated facts set forth the following circumstances leading up to its execution:
On September 28, 1995, the Highway Authority Commissioners addressed Item 16, "Garden State Arts Center Privatization", on their Agenda and unanimously voted (with one abstention) to execute the Memorandum of Agreement with the entity now known as GSAC Partners ("GSAC") for the leasing and operation of the Arts Center.
Prior to that vote, a presentation was made to the Authority Commissioners by the Executive Director of the Arts Center with respect to leasing the Arts Center to a private entity. That presentation noted the following terms which are also found in the later Lease:
(a) The capacity of the Arts Center would be increased from 7,000 to 17,500;
(b) The new operator would have the benefit of a 21 year lease;
(c) $1,650,000, of revenue was to be guaranteed to the Highway Authority in 1997 and $34,000,000 over twenty years;
(d) Additional revenue generated by the lessee/operator to the Highway Authority could be a maximum of $2.5 million per year and $52 million over twenty years;
(e) Some $8.7 million in capital improvements would be made by the lessee/operator;
(f) The lessee-operated Arts Center would save the Highway Authority administrative costs of some $200,000 $600,000 annually;
(g) The lease arrangement would remove the Highway Authority from the entertainment business;

*132 (h) The lessee/operator would be permitted to serve beer and wine to those in attendance and the Highway Authority would share in the revenue so generated; and
(i) The State of New Jersey would collect some $30,000,000 in sales tax on tickets and other sales over the twenty year life of the Lease (revenue which would not have been generated if the Highway Authority were the vendor).
The lease itself is described thusly:
On January 10, 1997, effective as of May 1, 1996, the Authority entered into a Lease Agreement, Easement Agreement and Declaration of Restrictive Covenants with GSAC (the "Lease").
Under Article 2 of the Lease, the Authority leased to GSAC, and GSAC rented and leased from the Authority (a) all of the Amphitheater Tract; (b) all improvements now or hereafter located on the Amphitheater Tract, including the Amphitheater; and (c) all vertical and subterranean rights, presently existing or hereafter arising, appurtenant to the Amphitheater Tract, and all interests in and to the streets or alleyways in or contiguous thereto owned or claimed by Landlord or in which Landlord has any right, title or interest.
In addition, under Article 2, the Authority granted and conveyed to GSAC a nonexclusive easement during the Term on, over and across Park Tracts and Parking Tracts for the purpose of providing vehicular and pedestrian ingress and egress to, from, between and among the (I) Amphitheater Tract, (ii) the public rights of way abutting the boundaries of the Entire Tract and (iii) the Parking Facilities.
....
(a) GSAC will be leasing all of the amphitheater tract which includes the amphitheater itself and all existing or future improvements in connection therewith, as well as having a license with respect to all of the parking tracts and later expansion of the parking lots;
(b) GSAC shall have the primary right to use and possess all of the existing and expanded parking facilities, subject to some limited exceptions, shall have the right to charge parking fees to those attending performances (never charged before) and the Authority shall share in such fees as part of its sharing in the Gross Revenues;
(c) GSAC shall have the right to sublease any part of the Arts Center which it is leasing, shall have the right to put liens on the Arts Center property and shall have the right to mortgage the twenty year leasehold interest held by GSAC;
(d) The Authority will not be permitted to put any new liens on the Arts Center property without making such liens subject first to the GSAC lease;
(e) The Authority is restricted from engaging in any activities competitive with GSAC for some twenty years, including (i) the presentment, promotion and production of live entertainment events, (ii) operation, management and use of commercial concert, amphitheater and arena facilities, (iii) organization, presentment and operation of fairs and festivals and (iv) operation and use of an education center or conference center;
(f) In addition to sharing in "gross revenues" as defined in the Lease, the Authority will also be receiving extensive rental income in accord with the formula found in the Lease;
(g) GSAC shall have the right to sell alcoholic beverages, including wine and beer, at the Arts Center; and
(h) GSAC shall have the right in conjunction with the Authority to use the two electronic Arts Center billboard signs located in the Arts Center complex for identifying sponsors and advertising events.
*133 The Reception Center, which Holmdel also seeks to tax, is somewhat distinct in that its use has existed since 1989 under the lease with 116 Park Caterers. Apparently Holmdel's review of the situation triggered by the GSAC lease caused it to reassess the circumstances of the use of the Reception Center under the 116 Park Caterers lease. As to that lease, the parties' stipulated facts state that the lease was entered into with 116 Park Caterers in 1989 and is automatically renewable by the Authority every two years. Critical to our analysis is the fact that 116 Park Caterers agreed to manage, operate and maintain the Reception Center to "provide the Activities to the general public in order to maximize economic potential." As we have previously said, the intended use of the Reception Center under the lease is as a "first-class high quality restaurant, catering, banquet and conference facility."

III.
Holmdel argues first that as originally constructed, the Arts Center complex was not within the legislatively authorized power of the Authority, that is to say, it did not fall within the scope of "project" as originally defined in N.J.S.A. 27:12B-3(d). As we will more fully discuss shortly, that definition was amended by the Legislature in 1968 and, as amended, is more restrictive in scope than it was initially. In this respect, Holmdel argues that, at the least, the Reception Center, apparently constructed after 1968, exceeds the Authority's powers under the more limited 1968 amendments and could not have been grandfathered by the 1968 amendments as it did not then exist.
Second, Holmdel contends that the Authority's twenty-one year lease with GSAC has so changed the use of those targeted portions of the Arts Center, which are now operated solely as a profit-making entertainment venture, that the tax immunity previously accorded the Arts Center can no longer exist. In this respect, it asks in its brief "[a]ssuming arguendo that tax exempt[ ] status attached to the Arts Center Complex ..., did the Legislature intend to bestow a tax exemption of the dimensions and character now claimed by the Highway Authority in the context of the GSAC lease? In establishing the Highway Authority, and even in the 1968 ratification of the Arts Center, did the Legislature intend to create an `oasis' for profit-making entertainment companies in the middle of New Jersey, an oasis free from local property taxation? Did the Legislature intend to create a tax-free, tax-exempt `trade zone' for such entertainment companies ... [?]"

IV.
We consider here a governmental tax immunity. It has been said, on the one hand, that governmental tax immunities "should be liberally construed." Walter Reade, Inc. v. Township of Dennis, 36 N.J. 435, 440, 177 A.2d 752 (1962). On the other hand, it has also been recognized that "[t]he taxing power lies at the heart of government" and, therefore, application of any particular tax immunity must "stand scrutiny" to demonstrate that it serves the intended public purpose, that is to say, that the object or activity for which the immunity is sought is within the boundaries of the governmental entity's statutory powers and within the provisions of the specific statute granting the asserted immunity. New Jersey Turnpike Authority v. Township of Washington, 16 N.J. 38, 44, 106 A.2d 4 (1954). A too expansive interpretation of governmental immunity such as that presently before us must be guarded against. Id. at 45, 106 A.2d 4 ("[w]e must decline to give a construction to the [Turnpike Authority's tax immunity] statute... that would render it unconstitutional. The phrase `property acquired or used by the Authority under the provisions of this Act,' ... can only be saved by construing the phrase in the conjunctive. It applies to property acquired for turnpike purposes and, having been so acquired, used for such purposes....").
*134 We also deal with facilities and activities owned by a public entity but operated by private for-profit companies pursuant to lease arrangements. At the outset, we think it plain that the Authority has specific statutory power to enter into leases of the type here. N.J.S.A. 27:12B-5(o), -14. Moreover, as a general proposition, such leasing arrangements do not trigger a loss of the governmental tax immunity, so long as the private enterprise uses or operates the subject property or governmental activity as it was intended to be used or operated under the governing statutory provisions and in a fashion the particular tax immunity was intended to benefit. Walter Reade, Inc. v. Township of Dennis, supra, 36 N.J. at 441, 177 A.2d 752 ("[w]e hold simply that the Legislature intended the Authority to be free of the burden of local taxation whether the Authority achieves the specific public purpose assigned to it by direct operation or through an authorized contractual arrangement with another.... "); City of Egg Harbor v. Atlantic County, 10 N.J.Tax 7, 19 (Tax 1988) ("[i]f a private user of public property is carrying out [the assigned] public purpose the real property will not be taxed for local property tax purposes."). Further, the fact that the private user or the public entity makes a profit does not mean that the property loses its immunity. See Walter Reade, Inc. v. Township of Dennis, supra, 36 N.J. at 441, 177 A.2d 752 (holding that restaurant operator, which leased and ran restaurants at Parkway rest areas, presumably for profit, was not liable for property tax, as such use was within the Highway Authority's express statutory power). Accord Martin v. Borough of Collingswood, 36 N.J. 447, 177 A.2d 759 (1962); In re Howard D. Johnson Co., 36 N.J. 443, 177 A.2d 756 (1962); Jersey City v. Department of Envtl. Protection, 227 N.J.Super. 5, 21, 545 A.2d 774 (App.Div.), certif. denied, 111 N.J. 640, 546 A.2d 551 (1988); Bloomfield v. Division of Tax Appeals, 84 N.J.Super. 19, 24, 200 A.2d 793 (App.Div. 1964); Bergen County v. Leonia Borough, 14 N.J.Tax 142, 158-59 (Tax 1994); City of Egg Harbor v. Atlantic County, supra, 10 N.J.Tax at 23.

V.
As we see it, then, the fundamental issue here is whether the operation and activities of the Arts Center complex under the GSAC and 116 Park Caterers leases are within "the boundaries of the authority delegated by the Legislature to the agency" and whether the use is within "the terms in which the Legislature bestowed the [tax] immunity." Borough of Moonachie v. Port of New York Auth., 38 N.J. 414, 422-23, 185 A.2d 207 (1962). For instance, the restaurant facilities offered at the Authority's service areas in Walter Reade, Inc. v. Township of Dennis, supra, 36 N.J. 435, 177 A.2d 752, and In re Appeal of Howard D. Johnson Co., supra, 36 N.J. 443, 177 A.2d 756, and the milk bar in the county park in Martin v. Collingswood, supra, 36 N.J. 447, 177 A.2d 759, were all within the specific statutory purposes to be served by each of the public entities and thus the properties retained their tax immunity though operated by private for-profit entities.
Moonachie illustrates the point. There the Borough of Moonachie challenged the tax immunity of a tract of land acquired by the Port Authority of New York and New Jersey as part of its operation of the Teterboro Airport. Pursuant to the specific tax immunity statute there at issue, the Port Authority was immune from local property taxes on any property it owned which was used "for air terminal purposes." Moonachie, supra, 38 N.J. at 418, 185 A.2d 207. The Teterboro Airport was originally purchased by the Port Authority with 450 acres of land. Subsequently, additional land was purchased, including a ten-acre parcel that the Port Authority bought for the purposes of a sound barrier. The land itself continued to be used for that purpose. But in order to turn some profit on the otherwise vacant land, the Port Authority leased the ten-acre parcel *135 to a private company, the Jersey Screen and Storm Window Co., Inc., and agreed to construct a building that would be used for that company's private for-profit purposes, i.e., "for the `design, manufacture and sale of metal windows, metal doors, metal siding, metal awnings, metal railings, metal building panels and any and all other metal building accessories.'" Id. at 417, 185 A.2d 207. The Court held that the ten acres, regardless of the building upon it, still furthered airport purposes, as it continued to serve as a sound barrier and was, therefore, entitled to the tax immunity. Id. at 428, 185 A.2d 207. In contrast the Court stated, "no reasonable interpretation, however liberal, can bring the building in question ... within the scope of" air terminal purposes. Id. at 427, 185 A.2d 207. "In such circumstances when the Port Authority entered the market place in search of a tenant for its building, it did so in competition with, and on the same footing as, a private property owner, and must be required to assume an equal share of the general tax burden with him." Id. at 427-28, 185 A.2d 207. The Court explained that when a tax immunity is called into question the reviewing court must "be satisfied that the Legislature intended to bestow a tax exemption of the dimensions and character claimed." Id. at 424, 185 A.2d 207 (citing Bush Terminal Co. v. City of New York, 282 N.Y. 306, 26 N.E.2d 269 (Ct.App.1940)):
The basic principle ... is that property owned by a public agency but employed primarily to obtain revenue or profit through private business uses is not immune from taxation, but property employed primarily for a public use does not lose immunity because the agency incidentally derives some private business income from it. Stated more precisely for present purposes, a tax exemption based upon a statute specifying a particular public use is clearly lost when the use to which the property is put is foreign to the prescribed use and the revenue motive in adopting the use is the primary or exclusive one.

[Id. at 426-27, 185 A.2d 207 (emphasis added).]

VI.
Applying these principles here, we must determine to what activity and/or use of its property does the Authority's statutory tax immunity apply and whether the components of the Arts Center complex at issue before us, as they are operated under the two subject leases, fall within the boundaries of that immunity. Consideration of the second part of this inquiry, under the particular facts, as they are before us, requires us to consider the 116 Park Caterers' lease use and the GSAC lease use separately.

a.
The Authority's tax immunity is set forth in N.J.S.A. 27:12B-16. It provides:
The exercise of the powers granted by this act will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and as the operation and maintenance of projects by the Authority will constitute the performance of essential governmental functions, the Authority shall not be required to pay any taxes or assessments upon any project or any property acquired or used by the Authority under the provisions of this act or upon the income therefrom, and every project and any property acquired or used by the Authority under the provisions of this act and the income therefrom, and the bonds or notes issued under the provisions of this act, their transfer and the income therefrom (including any profit made on the sale thereof) shall be exempt from taxation.

[Emphasis added.]
There are several notions about this immunity that we must first dispose of before considering its precise boundaries. First, facially, the language "every project and *136 any property acquired or used by the Authority... shall be exempt from taxation," suggests the only boundaries are that the subject of the asserted tax immunity is a project or property that is either owned or used by the Authority, regardless of the nature of the project or the use put to the property. We think that potentially unboundless notion is inconsistent with the Supreme Court's view of the immunity expressed in New Jersey Turnpike Auth. v. Township of Washington, supra, 16 N.J. at 45, 106 A.2d 4 (similar immunity provided by N.J.S.A. 27:23-12 for projects and property owned and used by the New Jersey Turnpike Authority applies to properties and projects acquired and operated by the Turnpike Authority only insofar as such projects and properties are put to a use authorized by the enabling Act).
Second, focusing upon the somewhat lengthy prefatory language in the first portion of N.J.S.A. 27:12B-16, we recognize that we said in Ironbound Educ. & Cultural Ctr., Inc. v. City of Newark, 220 N.J.Super. 346, 353, 532 A.2d 258 (App. Div.1987), certif. denied, 110 N.J. 200, 540 A.2d 192 (1988), that the Authority's tax immunity applies to any project or property "used to `benefit ... the people of the State for the increase of their commerce and prosperity and for the improvement of their health and living conditions.'" And see N.J.S.A. 27:12B-14. Viewed thusly, it might be said that the present use of the Arts Center complex for concerts featuring a wide variety of profit-producing entertainment, as well as civic events such as graduations and ethnic and holiday festivals, improves the "living conditions" of New Jersey residents, and that, further, the ticket and other revenues raised from the current use of the complex increase the State's "commerce and prosperity" and thus these uses are within the scope of the tax immunity. Cf. Paper Mill Playhouse v. Millburn Township, 95 N.J. 503, 506, 520, 472 A.2d 517 (1984) (holding that community theater, which produced and performed plays, was entitled to tax exemption as furthering the "moral and mental improvement of men, women and children"); Chester Theatre Group v. Borough of Chester, 115 N.J.Super. 360, 365, 279 A.2d 878 (App.Div.1971) ("the presentation of musical recitations advance[s] the intellectual and social bases of man in general....").
Indeed this is precisely what the judge concluded:
[t]here's no doubt in my mind, based on the case law, that the Arts Center as a project of the Authority, serves a public purpose and that that public purpose is not lost by the fact that it's privatized, by the fact that there are perks given to GSAC by way of the fact that it's going to be increased seating, and parking fees, and everybody is going to benefit out of it. But the concept of a public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole and which at the same time, is directly related to the functions of Government.
Moreover, it cannot be static in its implications. To be served as a whole, it must expand when necessary to encompass changing public needs of a modern, dynamic society. Roe v. Kervick, 42 N.J. 191, [207] [199 A.2d 834] (1964).
As stated in N.J.S.A. 27:12B-16, the purpose of the Legislature for providing tax exempt status to the Authority projects is for the benefit of the people of the State for the increase[ ] of their commerce and prosperity, and for the improvement of their health and living conditions.
The purpose of the Arts Center, looking back at the Public Autonomous Authority Committee Hearings from 1968 was not only to bring more traffic on the Garden State Parkway, creating more toll revenues, but to bring cultural arts, entertainment and other recreational facilities to the people of New Jersey. That's set forth in Volume III of the *137 Autonomous Authority Commission hearings.
It seems clear to this Court that the same public purpose was being served by the Arts Center in 1998 as it was 1996, 1997, 1998, as it was when it first opened.
Were the judge correct in her perception that the tax immunity conferred by N.J.S.A. 27:12B-16 is applicable so long as the Arts Center complex is used to serve "a public purpose," we would have no difficulty in accepting her ultimate conclusion. But, while the ultimate conclusion may, when all is said and done, be the correct one, her analysis of the scope of the Authority's tax immunity was too broad, as a result of which the critical inquiry that should have been made was not performed.
To begin with, our seemingly supportive statement in Ironbound is dicta. There was no issue of the tax immunity under N.J.S.A. 27:12B-16 before us there. More importantly, the prefatory language in N.J.S.A. 27:12B-16, which generally refers to the public benefits to be served, provides nothing more nor less than an explanation for why the Legislature decided to grant the Authority a tax immunity. That language does not establish what that tax immunity is for. Specifically, it does not say that any project engaged in by the Authority that might serve a public purpose is tax immune. The critical language, which we have underlined, is set forth in the remainder of the statute. That language limits the Authority's tax immunity to projects and property used for the purposes of the enabling act. Such purposes of course are public purposes, but they are discrete public purposes. That requires a more narrow and exacting analysis than was performed by the judge here. It is not generally whether the current use serves a public purpose; it is whether it fulfills a purpose that the Authority has been created to perform.

b.

GSAC Lease Use
As we previously stated, indeed as contained in the stipulated facts, the introductory statement to the Act stated that its purpose was as reflected by its title, that is "[a]n Act to facilitate vehicular traffic in the State of New Jersey by providing for the acquisition, construction, maintenance, repair and operation of highway projects." L. 1952, c. 16 (emphasis added). And see N.J.S.A. 27:12B-2. One would initially think then, that the focus of what the Legislature intended the Authority to engage itself in would be projects and/or property acquired or used for the furtherance of "facilitating vehicular traffic" in New Jersey. See Renaissance Plaza Assocs. v. City of Atlantic City, 18 N.J.Tax 342, 357-59 (Tax 1998).
The difficulty with this analysis, prior to 1968, is that the Legislature's definition of "projects" that it authorized the Authority to construct and operate is not so clearly restricted. Neither is the scope of the power delegated to the Authority to contract with others for the use of its projects. See N.J.S.A. 27:12B-14. We have already set forth the language of the original definition of "projects." We have also already observed that the original definition set forth in N.J.S.A. 27:12B-3(d) rather broadly referred to not only projects for express roadways, but also "such adjoining park or recreational areas and facilities as the Authority ... shall find to be necessary and desirable to promote the public health and welfare ..." (emphasis added). With the exception of the use of the Reception Center, to which we will shortly return, this language would seem to encompass the broad "public purposes" concept that both the judge and the Authority have relied on as set forth in Roe v. Kervick, 42 N.J. 191, 207, 199 A.2d 834 (1964). Of course, this rather broad language is followed by the reference to "bridges, tunnels, overpasses, underpasses, interchanges, traffic circles, grade separations, entrance plazas, approaches, toll *138 houses, service areas, service stations, service facilities, communications facilities, and administration, storage and other buildings which the Authority may deem necessary for the operation of such project...." An argument could be made that the entertainment-oriented components of the Arts Center complex presently before us have no relationship whatsoever to these statutorily listed projects. But the list of projects is preceded by the qualifying language "shall include but not be limited to...." Although not addressed by the Tax Court, we are inclined, therefore, to agree with the Authority that the Arts Center complex, as it was prior to 1968, was a project it could undertake pursuant to N.J.S.A. 27:12B-5(e) as then defined by N.J.S.A. 27:12B-3(d), notwithstanding the fact that it may, even then, have been entertainment-orienteda proposition that is not entirely clear from the record before us and to which we will shortly return.
We then come to the 1968 amendments. Here is how both parties in the stipulated facts below have described the legislative circumstances leading up to the enactment of those amendments:
In the late 1960's, the Authority undertook the construction of the Arts Center. The Arts Center construction raised debate in the legislature over whether the construction of the Arts Center was within the Authority's designated powers.
The debate surrounding the construction of the Arts Center spawned the formation of the Autonomous Authorities Study Commission (the "Study Commission").
The Study Commission hearings, held on May 14, June 19, and October 30, 1968, provided a forum for comment and questioning concerning the Authority's power to construct the Arts Center.
The Study Commission Hearings were opened by a statement of then Senator Matthew J. Rinaldo that was read into the record, urging the necessity of a bill recently passed by the state senate curtailing the recreational project powers of the Authority. Senator Rinaldo stated, however, that it was "too late" to do anything about the Arts Center then under construction.
While the Study Commission Hearings did provide a forum for some pointed questioning of Authority officials, the Hearings also provided testimony by these Authority officials, who were involved in the construction of the Arts Center complex, that the Arts Center complex was intended to contain parks and recreational facilities and that the Arts Center complex was true to this design.
Following the Study Commission Hearings, the legislature enacted L. 1968, c. 348 ...., which amended the Highway Authority Act and refined the Authority's power with respect to parks and recreational areas.

[Citations omitted.]
In part, the 1968 amendments redefined "project" in the following fashion:
any express highway, superhighway, or motorway ... together with such adjoining park or recreational areas and facilities directly related to the use of the express highway, superhighway or motorway as the authority ... shall find to be necessary and desirable for the convenience and comfort of users of the highway project.

[L. 1968, c. 348, § 3(d) (amending N.J.S.A. 27:12B-3(d)) (emphasis added).]
The 1968 amendments further added language to N.J.S.A. 27:12B-5.1 which prohibited the Authority from constructing or operating any "facility or activity not directly related to the use of a highway project except as may be specially authorized by law." L. 1968, c. 348, § 5.1(2). We think it perfectly obvious that under these amendments the use of the Arts Center under the GSAC lease would be ultra vires.
*139 But the legislative history of the 1968 amendments makes it fairy clear to us that, though troubled by its cost and non-highway related scope, the Legislature "grandfathered" the Arts Center complex, at least as it then existed. The amendments we have set forth above were enacted by Laws of 1968, chapter 348, over Governor Hughes' veto. Consistent with our reading of the amendments as proscribing a project such as the Arts Center were it built after 1968, the Governor's veto message expressed a concern over the impact of the amendments upon the then existing Art Center. In part, he said:
This bill would amend the law to limit the types of projects which may be undertaken by the New Jersey Highway Authority. It is common knowledge that the proponents of this bill have indicated strong objections to the construction of a cultural center in North Jersey by this Authority. This bill would, in effect, limit the Authority to projects which are directly related to the use of highway facilities and divest it of its current responsibility for operating the cultural center.

I need not make a decision as to the propriety of the Authority's action in the construction of a cultural center, since I am constrained to return this measure because it is defective.

[Emphasis added.]
Although the veto was overridden and the amendments were nonetheless enacted, N.J.S.A. 27:12B-5.1 was further amended by L. 1968, c. 441, § 1 to add the following sentence:
The continued operation of existing facilities or activities by the authority shall not be affected by the provisions of this act.

[Emphasis added.]
Operation of the then "existing facilities or activities" of the Authority could continue. All seem to agree this was a specific reference to the then existing Arts Center project. The Arts Center project, as it was then known, was, thus, grandfathered. Monarch Entertainment Bureau, Inc. v. New Jersey Highway Auth., 715 F.Supp. 1290, 1297 (D.N.J.), aff'd, 893 F.2d 1331 (3d Cir.1989). Important to our consideration of the issue here, and overlooked we think by the Tax Court, is that the grandfathering was of "existing" facilities and activities.
And this is the rub in this appeal as to the GSAC lease use. Because neither the parties nor the Tax Court saw this as an issue, no one addressed it below. No one argued and the Tax Court made no findings as to what the use, or proposed use, of the Arts Center was as presented to the Legislature at the time of the 1968 amendments.
We could attempt to make such findings exercising our original jurisdiction as there is reference to the use or proposed use of the Arts Center in the 1968 legislative hearings that were held prior to enactment of the amendments. Transcripts of those hearings were made part of the stipulated facts. Only brief mention of the contents of these transcripts and other material that may have been presented to the Legislature is made by the parties. Our own perusal of the transcripts shows that, initially, the project was envisioned as a recreational center which would include "an amphitheater type of swimming pools," an ice skating area, restroom facilities, restaurants, picnic facilities, tennis courts, baseball diamonds, volleyball courtsall recreational in nature. The concept for the Arts Center changed from this type of recreational/sports use to what was represented as an educational/cultural use. For instance, the legislators were told during the hearings that the Arts Center was used "mainly for culture, ballet, for the underprivileged, for the schools, and as a cultural center." Transcript of Hearings before the Autonomous Authorities Study Commission, vol. III at 6 (hereinafter Hearings).
It was also pointed out by the then Chairman of the Authority that the Arts *140 Center provided other activities such as "nature trails which are being operated by the Monmouth County Museum for three years. And there are thousands of children that go to the classes and go there.... They are using a house that we purchased. We have picnic tables there. We've had people who have used this for skiing for a time...." Hearings, supra, vol. I at 24. Additionally, one of the commissioners pointed out:
We have a young man, Mr. Crocker, who has been a teacher in the public schools in Newark and then teaching at Eatontown, who is Assistant to Mr. Tonti. He is a Negro. He is very able, a graduate of Westminster College, and he is working now on educational programs for the Board of Education and others. And we are going to justify this beyond any reason for anybody as a great educational center for the people there. And we will have programs, before and after, for what I think is going to meet a great need in the State of New Jersey, for the development of cultural entertainment for the people who are underprivileged.

[Hearings, supra, vol. I at 43-44.]
Another Authority witness represented:
We've contacted the Department of Education several times, and we thought of this about two years ago, and found a very enthusiastic response. Now, very shortly, we'll be in touch with every superintendent of every school district to find out which ones want to become actively engaged. And beginning this fall, and then every spring and fall thereafter, under that program, we will have several concerts a week where from one school district we'll bring in 5,000 grammar school children, under this cooperative program, and give them an exposure to the performing arts. That's one part of the educational program.
The other part which will take place this summer is presently being vigorously pursued, whereby we will have programs in the daytime hours, one or two days a week, where from a lot of our large cities, like Newark, Elizabeth, Paterson, Camden, we will bring in youngsterswe're working with the various poverty groups on thisbring in youngsters to spend a day at Telegraph Hill, to go over our nature trails and then see a performance. We'll have some of the great starswe're negotiating with Belafonte to perform in the daytime for the children, and other starsto give them the excitement not only of the performing arts but to spend a day in the country.
So there is a twofold program, one is a summer program and one is the educational program which will become part of the school life of the children of New Jersey in any school district that wishes to participate in the program.

[Hearings, supra, vol. I at 60-61.]
In addition, the fact that the Arts Center complex offered over 2000 parking spaces that were free was promoted as a selling aspect of the facility. The Legislature was told "there isn't a facility in the United States, except the Garden State Parkway, and we charge tolls, that will have free parking facilities of that nature." Hearings, supra, vol. I. at 43.
Other portions of the hearings record reflect that in 1968, the Arts Center was actually being used for performances by "outstanding artists from the classical and popular performing world," Hearings, supra, vol. III at 66, and that the capacity of the Arts Center had been increased to exceed 5000 in order to accommodate "leading artists." Hearings, supra, Vol. III, at 63-64. The Legislature was informed that the Arts Center also featured a Jazz Festival, a talent show, and a performance by the United States Army Field Band and Soldiers' Chorus. Hearings, supra, vol. III at 66-67. The transcripts also reflect that the legislators were aware that even then the Authority was contracting with private entities for the management of some of the "performing arts" use of the *141 Arts Center. Hearings, supra, vol. III at 44-45.
The record is silent as to the use of the Arts Center during the intervening years prior to the GSAC lease. We have a sense of that use, however, from the following recitation by Judge Debevoise in 1989 in Monarch Entertainment Bureau, Inc. v. New Jersey Highway Auth., supra, 715 F.Supp. at 1292:
The Center is a roofed, open-air amphitheater which can accommodate an audience of over 10,000 in covered seating and on the adjoining lawn. The center offers concerts and other entertainment featuring a variety of popular and cultural artists for a paid admission fee in the late spring, summer, and early fall. The Authority's 1987 annual report indicates that a total audience of 419,207 ticketholders attended 65 "professional" evening performances with an average attendance of 6,314 per performance. The operations of the Center grossed over nine million dollars in 1987; of that sum ticket sales accounted for $8,314,184.
For the last five years, the Authority has retained the services of Ron Delsener and his company, Ardee Festivals, Inc. (Ardee), to book performances at the Center. In 1986, the Authority and Ardee entered into an agreement continuing this relationship through the 1990 season. This agreement provides that Ardee is to be compensated through the payment of a flat management fee, an incentive fee based on average paid attendance and, potentially, a percentage of any revenues gained from corporate sponsorship.
In contrast to the use as described in Monarch, but consistent with what appears to have been told to the legislators during the 1968 hearings, the Authority has reserved the right under the GSAC lease to use the Arts Center for:
the presentation and holding during each Lease Year of (i) up to ten ethnic heritage festivals of a similar nature, and at the same general times, as have been presented or held at the Amphitheater and/or in the mall and plaza area in years preceding ..., (ii) up to twenty events, performances or shows for which the Patrons attending are not required to pay any fee or other charge for admission, and (iii) a non-gated winter holiday celebration and display in the mall and plaza area during the months of November and December.
This more limited use might be considered distinct from the present "entertainment" use under the GSAC lease. Moreover, we know too that the GSAC use is distinct in that alcohol can now be served, there is now a fee for parking, and sales taxes are collected on tickets.
But whether the reserved use under the lease actually represents that which the Legislature thought in 1968 the Arts Center complex that it grandfathered would be put to cannot be definitively resolved on the record before us. Even if the present use is now different, whether that difference makes the use under the lease "foreign" within the meaning of Moonachie is too important an issue to be resolved by the exercise of our original jurisdiction on this record.

c.
We deal separately with the Reception Center under the 116 Park Caterers lease. The record suggests that the Reception Center was constructed some time after the 1968 amendments. Our independent review of the 1968 hearings reflects a concern on the part of the legislators over future implementation of what may as of then only have been tentative thoughts of further use of the Arts Center. We cannot tell from this record whether the Reception Center was then in the planning stagescertainly we have found no reference to it in the 1968 hearings.
But that simply was not the focus below. That is to say, because the focus was on whether the present use of the Arts Center complex serves a "public purpose," *142 there was no effort to determine what the contemplated use was in 1968 and, as to the Reception Center, whether it was even at that time in the planning stages. If in the planning stages, can it be said that the Legislature approved it, along with the existing Arts Center? We are inclined to think not. But even if approved as planned, was its final construction and is its present use under the 116 Park Caterers lease "foreign" to what the Legislature grandfathered? It seems fairly clear to us that the activities of this Reception Center are far beyond those authorized under the 1968 amendments. We do not believe the Authority contends otherwise. But the record is insufficient for us to determine whether, somehow, the Reception Center could have been part of what existed in 1968 despite its apparent construction in the 1980's. If it was not contemplated in 1968, it clearly is not entitled to a tax immunity. Even if it was contemplated, its eventual use under the 116 Park Caterers may be too far removed from the initial contemplated use to warrant application of the tax immunity.
As with the GSAC lease use, then, what we believe should have been the inquiry below was not. The parties and the Tax Court did not separately focus on the Reception Center. The issue, we think, is too significant for us to treat as a court of original jurisdiction. The Tax Court and the parties should in the first instance have the opportunity to address the Reception Center issue, as well as the GSAC lease issue, and flesh out the record with such additional evidence as may exist and as may be necessary, and to reach a legal conclusion in the context of that record.

VII.
We therefore reverse and remand to the Tax Court for further proceedings and reconsideration consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The proceedings below were not the subject of a plenary trial-type hearing. Rather, the parties stipulated to certain "facts." As we will develop hereafter, consideration of the significant issues presented in this appeal suffers from the limited nature of the evidentiary portion of the proceedings below.
[2] Were the billboards the only issue before us, we would have no hesitancy in rejecting Holmdel's contention that they are now taxable. South Jersey Transp. Auth. v. City of Pleasantville, 312 N.J.Super. 438, 712 A.2d 215 (App.Div.1998).