KUSKIN, J.T.C.
I.
Background
A. General.
For tax years 1996, 1997 and 1998, the Township of Holmdel (“Holmdel”) determined that certain facilities then owned by the New Jersey Highway Authority (“Highway Authority”) and located at the Garden State Arts Center (‘Arts Center”) ceased to qualify for property tax exemption. The Arts Center is located in Holmdel at Exit 116 on the Garden State Parkway which provides the only means of public motor vehicle access. The property is designated as Block 27.01, Lot lOx on the township Tax Map. During the years under appeal, the Arts Center consisted of a 400 acre park with the following buildings and improvements that are *432 the subject of these appeals: a roofed, open air amphitheater with ticket booths and refreshment stands (“Amphitheater”), a building known as the Celebrity House, a building known as the Robert B. Meyner Reception Center (“Reception Center”), two electronically controlled billboards facing the Parkway, parking areas, and roadway areas. These facilities are hereafter referred to collectively as the “Arts Center Complex,”[1] and the Amphitheater, Celebrity House, billboards, parking areas and roadway areas, as they from time to time existed at the Arts Center, are hereafter referred to collectively as the “Amphitheater Facilities.”
Holmdel’s tax assessor imposed an omitted added assessment on the Arts Center Complex in the amount of $14,261,200 for tax year 1996, an added assessment in the same amount for tax year 1997, and a regular assessment of $200 for tax year 1998. For each of tax years 2000, 2001, 2002 and 2004, the Complex was assessed at $1,717,000. The Highway Authority and Holmdel appealed the assessments imposed for 1996, 1997, 1998, 2000, and 2001. For tax year 2002, only the Highway Authority appealed, and Holmdel asserted a counterclaim. For tax year 2004 the New Jersey Turnpike Authority (“Turnpike Authority”), the successor in interest to the Highway Authority,[2] appealed the assessment as did Holmdel. No appeals were filed for tax years 1999 and 2003. Holmdel’s appeals and counterclaim sought an increase in the amount of each assessment, and the Highway Authority and Turnpike Authority sought a tax exemption for each year under appeal. For the reasons set forth below, I deny the exemption claim except as to the Amphitheater Facilities for tax year 1996.
*433 For tax years 1996, 1997, and 1998, the Tax Court determined that the Arts Center Complex qualified for exemption. The Appellate Division reversed and remanded. Township ofHolmdel v. New Jersey Highway Authority, 329 N.J. Super. 410, 748 A.2d 128 (App.Div.2000) (“Remand Opinion”). In the Remand Opinion, the Appellate Division directed the Tax Court to conduct further proceedings and make determinations for tax years 1996, 1997 and 1998 as to the following: (1) whether the use of the Arts Center Complex under a lease agreement between the Highway Authority and GSAC Partners (“GSAC”) dated January 10, 1997 and effective as of May 1, 1996 (the “GSAC Lease”) “actually represents that [use] which the Legislature thought in 1968 the Arts Center Complex that it grandfathered [by legislation enacted that year] would be put to,” id. at 431, 748 A.2d 128 and (2) whether the Reception Center, completed in 1989, was contemplated by the Legislature in connection with the 1968 legislation, and, if so, whether the use to which the Reception Center was being put for the years under appeal, pursuant to an agreement between the Highway Authority and 116 Park Caterers (the “Park Caterers Agreement”) was “too far removed from the initial contemplated use to warrant application of the tax immunity.” Id. at 432, 748 A.2d 128. The parties have agreed that a determination of these issues pursuant to the Remand Opinion will be applicable for tax years 2000, 2001, 2002, and 2004.
The Park Caterers Agreement was replaced, effective March 26, 1996 by an agreement between the Highway Authority and Bott. Inc., t/a Merri Makers (the “Mem Makers Agreement”). This latter agreement apparently was not brought to the attention of either the Tax Court or the Appellate Division in connection with the proceedings culminating in the Remand Opinion. As will be discussed in more detail below, the Park Caterers Agreement and Mem Makers Agreement had virtually identical terms and provisions, except that the annual payments under the Merri Makers Agreement differed from those under the Park Caterers Agreement. Because of the similarity between the two agreements, I will treat the Merri Makers Agreement as encompassed by references in the Remand Opinion to the Park Caterers Agreement.
*434 The Remand Opinion included a determination that the Highway Authority was authorized to construct the Arts Center as a “project” permitted under N.J.S.A 27:12B-2, a provision of The New Jersey Highway Authority Act (“Highway Authority Act”), N.J.S.A. 27:12B-1 to -26, enacted in 1952 as L. 1952, c. 16. The term “project” or “highway project” was defined in N.J.S.A 27:12B-3(d), as originally enacted, as including “any express highway, superhighway or motorway ... together with ... adjoining park or recreational areas and facilities.” Under N.J.S.A 27:12B-16, projects were granted a tax exemption as follows:
[T]he [Highway] Authority shall not be required to pay any taxes or assessments upon any project or any property acquired or used by the Authority under the provisions of this act ... and every project and any property acquired or used by the Authority under the provisions of this act ... shall be exempt from taxation.
[N.J.S.A. 27:12B-16]
The Remand Opinion contained a further determination that legislation enacted in 1968, L. 1968, c. 348, would have prohibited the Highway Authority from operating the Arts Center Complex but for a further amendment, also enacted in 1968, that “ ‘grandfathered’ the Arts Center complex, at least as it then existed.” Township of Holmdel v. New Jersey Highway Auth., supra 329 N.J.Super. at 427, 748 A.2d 128. Under L. 1968, c. 348, § 1, the definition of “project” and “highway project” in N.J.S.A 27:12B-3(d) was amended to limit the recreational areas and facilities included in the definition to those “directly related to the use of the express highway, superhighway or motorway,” L. 1968, c. 348, § 1. Under L. 1968, c. 348, § 2, a new statute N.J.S.A 27:12B-5.1, was added. This statute provided in its entirety that: “The authority shall not engage in construction or operation of any facility or activity not directly related to the use of a highway project except as may be specially authorized by law.” Governor Hughes vetoed these amendments because, as stated in his veto message, they would impair the outstanding Highway Authority bonds issued in connection with creation of the Highway Authority and construction of the Garden State Parkway by “in effect, limiting] the Authority to projects which are directly related to the use of highway facilities and divestpng] it of its current responsibility for operating the cultural center.” The Legislature *435 overrode the veto and addressed the Governor’s concerns in L. 1968, c. 441, § 1 by adding the following sentence to N.J.S.A. 27:12B-5.1: “The continued operation of existing facilities or activities by the authority shall not be affected by the provisions of this act.”
On May 27, 2003, approximately three years after issuance of the Remand Opinion, the New Jersey Legislature enacted L. 2003, c. 79. This legislation (“Merger Legislation”) repealed the Highway Authority Act, as amended, and amended the statutes creating and regulating the New Jersey Turnpike Authority, N.J.S.A. 27:23-1 to -40 (“Turnpike Authority Act”), as well as certain related statutes, so as to effect a merger of the Highway Authority into the Turnpike Authority. The Merger Legislation amended N.J.S.A. 27:23-3(A), to provide that, “acquisition, construction, operation, improvement, management, repair and maintenance of transportation projects or any part thereof [by the Turnpike Authority] shall be deemed and held to be an essential governmental function of the State.” The definition of “transportation project” included “highway projects.” N.J.S.A. 27:23-4, and the definition of “highway project” included “the Garden State Arts Center as transferred to the [Turnpike Authority].” N.J.S.A. 27:23-4. A tax exemption for “transportation projects” was contained in N.J.S.A. 27:23-12, which, as amended by the Merger Legislation, provided in its entirety as follows:
The exercise of the powers granted by this act will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and as the operation and maintenance of transportation projects and other property by the Authority will constitute the performance of essential governmental functions, the Authority shall not be required to pay any taxes or assessments upon any transportation project or any property acquired or used by the Authority under the provisions of this act or upon the income therefrom, and any transportation project and any property acquired or used by the Authority under the provisions of this act and the income therefrom, and the bonds issued under the provisions of this act, their transfer and the income therefrom (including any profit made on the sale thereof) shall be exempt from taxation. The Legislature reaffirms that all existing facilities and property, and their operations, and management, of the authority and of the New Jersey Highway Authority, as transferred to the authority, are deemed public and essential governmental functions and are exempt from local taxes or assessments.
[N.J.S.A. 27:23-12.]
*436 As a result of the enactment of the Merger Legislation, I must address not only the issues specified in the Remand Opinion, but also the impact, if any, of the Merger Legislation on the Authorities’ tax exemption claims for the years covered by the Remand Opinion and the later years under appeal. Holmdel contends that the Arts Center Complex did not qualify for exemption under the Merger Legislation or under N.J.S.A. 27:12B-16, a provision of the Highway Authority Act, for any year under appeal on the following bases: (1) the use of the Amphitheater and related facilities under the GSAC Lease was not contemplated by the 1968' Legislation; (2) the Reception Center was not contemplated by, and was prohibited by, the 1968 Legislation; (3) under the GSAC Lease, Park Caterers Agreement, and Merri Makers Agreement, the Highway Authority and Turnpike Authority were not operating the Arts Center Complex primarily for the public purpose contemplated by the statutes governing each Authority and were operating the Complex primarily for the purpose of generating revenue, (4) the Merger Legislation did not contain a separate statutory basis for exemption and merely continued in effect the exemption to the extent authorized by the 1968 Legislation; and (5) any legislation granting a tax exemption to the Arts Center Complex, as it was being operated during the years under appeal, would violate two provisions of the New Jersey Constitution, namely, Article VIII, § 1, ¶ 1 (requiring that property be assessed “under general laws and by uniform rules”) and Article IV, § 7, ¶ 9 (prohibiting special legislation).
The Authorities respond that the operations at the Arts Center Complex during the years under appeal were within the contemplation of the Legislature when it enacted the 1968 Legislation because the operations constituted a continuation of operations and activities in place in 1968 even if, as described below, the Amphitheater Facilities were enlarged and the Reception Center was constructed. As to the Reception Center, the Authorities assert that its use was for the same types of functions that previously were held in the Celebrity House, a facility existing in 1968. The Authorities contend that all of the activities and operations at the Arts Center Complex during the years under *437 appeal had primarily a public purpose as intended by the 1968 Legislation, and dismiss Holmdel’s constitutional arguments as without merit. The Authorities rely heavily on the Merger Legislation as conferring a tax exemption for 2004 and as confirming that the Arts Center Complex qualified for tax exemption for the preceding years now at issue.
In lieu of a hearing with respect to the remand years, 1996, 1997, and 1998, and the later years under appeal, the parties elected to submit the matter for decision based upon a Stipulation of Facts and the documents to which the Stipulation refers. Most of the factual background contained in the Stipulation was presented to the Tax Court previously and is summarized in detail in the Remand Opinion. Consequently, I will extract from the Remand Opinion the facts which I regard as particularly relevant to this opinion and will supplement those facts from the Stipulation of Facts and supporting documents submitted to me.
B. The Construction, Purpose, and Use of the Arts Center Complex.
1. Construction of the Original Amphitheater Facilities.
As set forth in N.J.S.A. 27:12B-2, the Highway Authority’s purpose was:
to facilitate vehicular traffic and remove the present handicaps and hazards on the congested highways in the State, and to provide for the construction of modern express highways embodying every known safety device____
[N.J.S.A 27:12B-2.]
N.J.S.A. 27:12B-4 designated the Authority as “an instrumentality exercising public and essential governmental functions” and provided that the exercise by the Authority of its statutory powers “in the construction, operation and maintenance of projects shall be deemed and held to be an essential governmental function of the State.”
The Highway Authority acquired the 400 acre park in which the Arts Center Complex was constructed pursuant to N.J.S.A. 27:12B-5(e). This statute empowered the Authority to “acquire, *438 construct, maintain, repair and operate projects.” The definition of “project” was:
any express highway, superhighway or motorway ... together with such adjoining park or recreation areas and facilities as the authority, with the concurrence of the Department of Conservation and Economic Development[3] shall find to be necessary and desirable to promote the public health and welfare and feasible for development pursuant to this act, and shall include but not be limited to all bridges, tunnels, overpasses, underpasses, interchanges, traffic circles, grade separations, entrance plazas, approaches, toll houses, service areas, service stations, service facilities, communication facilities, and administration, storage and other buildings which the authority may deem necessary for the operation of such project, together with all property, rights, easements and interests which may be acquired by the authority for the construction or the operation of such project.
[N.J.S.A. 27:12B-3(d) (emphasis added).]
The initial plans prepared by the Highway Authority for use of the site included two swimming pools, an ice skating area, rest room facilities, restaurants, picnic facilities, twenty-four tennis courts, baseball diamonds, bridle paths, volleyball courts, and an observation tower memorial. These plans were modified to substitute the Amphitheater Facilities (including the Celebrity House which already existed) for the improvements originally planned. Construction of the Amphitheater, parking areas, roadways, and signs was completed in 1968, and the Highway Authority first presented performances at the Amphitheater during the Summer of that year.
2. The Autonomous Authorities Study Commission.
As the Amphitheater Facilities were nearing completion, certain legislators voiced opposition to their construction, and, in response, the Legislature formed the Autonomous Authorities Study Commission (“the Study Commission”) to study the functions and operations of autonomous authorities in the State, including the Highway Authority. The Commission conducted public hearings in 1968 at which John B. Townsend, then vice-chairman of the Highway Authority, described the “prime responsibility” of the Highway Authority as the operation of a safe toll road. Public *439 Hearings before the Autonomous Authorities Study Commission (“AA Hearings”), Vol. III at 5 (October 30, 1998). He described the purpose of the Arts Center as being “mainly for culture, ballet, for the underprivileged, for schools, and as a cultural center.” Id. at 6. He identified as another purpose the generation of more traffic on the Garden State Parkway during off hours, thereby producing more toll revenue. Id. at 7.
Sylvester C. Smith, Jr., then chairman of the Highway Authority, in explaining to the Study Commission why, in his view, the Amphitheater Facilities constituted a recreational facility within the meaning of the definition of a “project” set forth in N.J.S.A. 27:12B-3(d), emphasized the cultural nature of the Arts Center, attendance by children, and use of the nature trails, stating: “1 don’t know of anything more recreational nor more educational than perhaps having the cultural and performing arts.” AA Hearings, Vol. I at 24 (May 14, 1968). He also emphasized the function of the Arts Center as an educational facility and its focus on developing “cultural entertainment for the people who are underprivileged.” Id. at 44. He stated that “we didn’t want high priced restaurants with people in private business there”. Id. at 22. He assured the Study Commission that, although traffic generation on the Parkway was one of the functions of the Arts Center, performances would not be held on Friday night or Sunday night during July and August when the traffic volume was already heavy, stating: “The policy has been set by the Authority. We have the authority and control.... Saturday nights, yes, not on Friday or Sunday.” Id. at 28. Chairman Smith also commented that the facility “will have over 2,000 parking spaces that are free. And there isn’t a facility in the United States, except the Garden State Parkway, and we charge tolls, that will have free parking facilities of that nature.” Id. at 43.
The executive director of the Highway Authority, D. Louis Tonti, described the “prime purpose” of the Arts Center to be the providing of “recreational facilities for the public welfare and in the public interest.” AA Hearings, Vol. III at 11A-12A. In a written statement, Mr. Tonti explained to the Study Commission *440 the Highway Authority’s decision to build the Amphitheater Facilities as follows:
Our preliminary research showed that, as a state-wide facility, the [Garden State] Parkway would not be making a meaningful contribution in the public interest by providing the kind of athletic facilities contemplated in the original engineering-plan. I became acutely aware of the numerous reports which spelled out a growing interest, in New Jersey and the nation, in the performing arts. When further studies indicated that there was a great public need for facilities of this nature, we merely substituted the present concept for the earlier one, while still complying with our statutory obligation to provide recreational facilities.
[Statement of D. Louis Tonti AA Hearings Executive Director, New Jersey Highway Authority, submitted to Autonomous Authorities Study Commission, AA Hearings, Vol. III at 60A-61A (October 30,1998).]
Mr. Tonti reported that 400,000 people, “at least a fourth of whom were youngsters” visited the Arts Center site during 1968 either for performances or to use the nature trails, 55,000 elementary school children attended nineteen special daytime programs in the Amphitheater, 12,000 people attended a talent expo for young amateurs, 10,000 adults and children took tours of the nature trails, 30,000 senior citizens and youngsters from disadvantaged areas of New Jersey attended rehearsals or performances free of charge, and 59 evening performances by classical and popular artists took place from which gross admissions exceeded $1,000,000. Id. at 66A.
In its Interim Report of January 1969, the Study Commission stated that its success could be measured by the legislation which it had generated, specifically Senate Bill No. 493.
Senate No. 493 (later Chapter 348, Laws of N.J.1968) amended pre-existing charter and enabling provisions of the New Jersey Highway Authority to limit the Authority’s functions to those “directly related to the use of the express highway” and to delete from the recital of permissible functions those ambiguities under which the Authority had claimed it could undertake projects such as the Cultural Center at Telegraph Hill. The Commission hearings had brought out and had underscored the tenuous nature of the basis upon which the Authority had embarked on such activities.
[Interim Report of the Autonomous Authorities Study Commission at 3 (January 1969).]
3. The Senate Special New Jersey Highway Authority Investigation Committee.
In the late 1980’s, the operations of the Highway Authority received further legislative scrutiny, this time from the Senate *441 Special New Jersey Highway Authority Investigation Committee (the “Investigation Committee”) which met in 1988 and 1989. Although these proceedings do not constitute typical legislative history with respect to the 1968 Legislation, they provide information as to the facilities comprising the Arts Center Complex as of the date of the 1968 Legislation and insight as to the concerns of the Legislature in enacting the 1968 Legislation.
One facility addressed specifically by the testimony before the Investigation Committee was the Celebrity House and its relationship to the Reception Center. As of the Investigation Committee’s first hearing concerning the Arts Center in October 1988, the Reception Center was nearing completion (construction was completed in December 1988 and a certificate of occupancy issued in March 1989). The then administrative manager of the Arts Center, Patricia M. Horan, and then executive director of the Highway Authority, George Zilocchi, testified that the Celebrity House functioned as an arm of the Arts Center for use by nonprofit groups, corporations, and other entities that purchased tickets to a performance and wanted to have a limited function before the performance. Public Meeting before Senate Special New Jersey Highway Investigation Committee 37-38 (October 13, 1998). Heritage festivals at the Arts Center also made use of the Celebrity House. Id. at 37. Mr. Zilocchi acknowledged that these uses did not commence until the early 1970’s, probably in 1972. Id. at 38. He described the decision to construct the Reception Center as based on a finding by the Highway Authority that the “demand and requests for [the Celebrity House] were growing,” and therefore a facility that would accommodate far more people than the seventy person capacity of the Celebrity House was needed. Id. at 33.[4]
*442 The Highway Authority Commissioners first considered construction of the Reception Center in 1988. In 1984, the Authority obtained a legal opinion from its attorney indicating that the construction was authorized under the 1968 Legislation. In February 1987, however, the Office of Legislative Services rendered a legal opinion stating that the construction was not permitted because (1) the proposed facility was not directly related to the use of a highway project, (2) as a result of its size (14,200 square feet), the facility “clearly [was] not the ‘continued operation of existing facilities,’” and (3) as a result of its proposed use for events such as revenue producing corporate meetings and trade shows, the facility “cannot be said to be housing the ‘continued operation of existing facilities or activities by the authority.’ ” The opinion concluded: “The construction of the proposed facility appears to be exactly the type of project that the Legislature sought to control in enacting P.L. 1968, c. 348.” The Highway Authority was not deterred by this opinion, and construction of the Reception Center proceeded.
As originally conceived, the Reception Center was to be adequate in size for use by approximately 150 people for dinner and 300 people for a stand-up reception. The building was then expanded to accommodate 350 people for dinner and 500 for a stand-up reception. This expansion was never discussed at a public meeting of the Highway Authority Commissioners. The sensitivity of the Authority to public scrutiny of its plans was reflected in a March 7, 1985 memorandum from its chief engineer to its executive director. The memorandum stated as follows:
If we are to revise the contract before design to recognize this increase [in size] it will be necessary to have the Commissioners act in a public meeting. If, however, we sign the contract on the original parameters and then direct Mr. Kobayashi [(the architect)] to increase the size of the building under the ‘extra work’ provisions of the contract, you will be required to notify the Commissioners of the authorization for extra work, but public action would not be required.
I am reluctant to expose the construction of the reception building to another public meeting, because it is too easy for people to criticize. We acted in a public meeting once. I don’t think we should stretch our luck.
[Public Meeting before the Investigation Committee, supra at 46-47.]
In response to the question “what, conceptually, was [the Reception Center] designed to do,” Mr. Zilocchi stated:
*443 A continuation of what was being done at the old Celebrity House. We are looking to utilize this facility for receptions and group theater parties in connection with the Arts Center season. We are looking to utilize this facility to put on seminars and art exhibits; also, as a continuation of our program for a small theater in the round or seminars for senior citizens and school children; and on a rental basis.
[Id. at 65.]
Ms. Horan testified before the Investigation Committee that she envisioned the Reception Center as an adjunct to the Celebrity House and that it would be used to raise money for the Garden State Arts Center Foundation (whose funds were used to present admission-free performances at the Amphitheater for school children and senior citizens).
Notwithstanding the foregoing testimony, the following colloquy occurred as to the proposed use of the Reception Center:
Senator Ambrosio: As I understand it, up until this year, the Arts Center was a May to September operation, and you closed down through the winter. Is that right?
Ms. Horan: Yes, that is correct.
Senator Ambrosio: This [(Reception Center)] will be an all year round facility. In addition to using it in conjunction with the Arts Center — as I understand your testimony, George [Zilocehi], — this hall is going to be for hire. Right?
Mr. Zilocehi: Oh, absolutely, Senator.
Senator Ambrosio: So you are going to expect to rent this out for parties, maybe weddings, whatever. It is going to be a catering hall.
Mr. Zilocehi: It will be utilized for those things also, yes, sir.
[Id. at 72.]
In or about March 1989, the Highway Authority engaged management consultants to assist it in soliciting proposals for rental of the facility. As of the date of the foregoing testimony, April 11, 1989, the Highway Authority was negotiating with a private party for operation of the Reception Center. Mr. Zilocehi testified that the prospective operator
will bo responsible for operating the entire facility ...
He’s responsible for all the expenses and so on and will be managing all the events at that facility. Those events will consist of events that we will have, events in conjunction with the Arts Center operations — and this is a year round facility— whatever other events come about that people will inquire about utilizing.
[Public Meeting before Senate Special New Jersey Highway Authority Investigation Committee 10 (April 10,1989).]
Mr. Zilocehi also testified that, if the Highway Authority wished to hold an event at the Reception Center, it would have to pay the *444 lessee for use of the facility, but would receive a percentage of gross with guaranteed minimum amounts per year. Id. As described by Mr. Zilocchi, the rental payments would include an annual minimum amount commencing in 1990 (no minimum payment was required for 1989), when the minimum guaranteed rental amount was to be $150,000. Id. at 11. The payment would be increased to $250,000 in 1991 and $350,000 in 1992. Ibid. These minimum amounts would be credited against the percentage rent payable by the operator. Mr. Zilocchi described the proposed operator as a “caterer.” Id. at 18.
The Investigation Committee hearings also considered the Amphitheater and related facilities at the Arts Center Complex. The Committee members’ questions, and thus the testimony, related primarily to the management of the facility. As a result, most of the testimony is of limited relevance to the exemption issue before me. However, testimony as to sponsorships at the Arts Center is informative. As of the date of the hearings, Ron Delsener was responsible for the booking of performances at the Amphitheater and for seeking corporate sponsorships for the Arts Center. Id. at 102. He testified that he was restricted in his efforts to obtain sponsors by oral instructions from the Highway Authority Commissioners prohibiting sponsorships by the alcohol or cigarette industries. Id. at 102-103.
No legislation affecting the operations of the Arts Center Complex resulted from the Investigation Committee hearings. In October 1989, the Investigation Committee issued its Second Interim Report. The portion of the report dealing specifically with the Reception Center contained the following statements:
The Committee believes that the construction of this $6.4 million facility violated state law which was specifically amended in 1968 to limit the Authority’s ability to engage in projects which are not related to the operation of the highway.
The lease agreement for this facility, and the enormous costs associated with building and furnishing the edifice, reveal that the Authority had no financial plans to sustain its operations, much less promote programs for the Cultural Fund recipients. Therefore the arguments to justify building the Facility to promote the public good cannot be sustained.
[Second Interim Repcni of Senate Special New Jersey Highway Authority Investigation Committee 30 (October 1989).]
*445 The Authority constructed the Reception Facility at a total cost of $6.4 million. This project was undertaken without conducting any comprehensive marketing analyses, survey research or financial feasibility review — also neglecting to document expected operating expenses____The current operating costs are estimated at approximately $250,000 per year ... If the $6.4 million in construction and furnishing costs were amortized, an additional expense of some $500,000 per year would be allocatable....
[Id. at 32.]
Clearly, the Reception Facility cannot meet its costs, much less generate funds to promote cultural events for New Jersey’s children, senior citizens, or disadvantaged. This ill-conceived and ill-executed project would have been avoided with appropriate legislative input.
[Id. at 33.]
The Report also recommended that both the Amphitheater and Reception Center “should be separated from the management of the New Jersey Highway Authority” with ownership remaining in the Authority. Id. at 83. The Committee concluded that, as a result, “the bond covenants between the Authority and its bondholders will be observed, yet the Authority will be forced to focus on its fundamental function — to run a highway, the most heavily traveled commuter roadway in the United States.” Ibid. The Committee also recommended that the Authority not make any expenditures from its capital construction fund except for emergency repairs. Id. at 34.
4. The Park Caterers Agreement.
In May 1989, before conclusion of the Investigation Committee hearings, the Highway Authority entered into the Park Caterers Agreement, which, although described at the hearings by Mr. Zilocchi as a lease, was entitled “Operating License Agreement”. 116 Park Caterers, a New Jersey corporation, was the licensee. The initial term of the Agreement expired January 31, 1993, but was subject to renewal for periods of two years each. The Agreement continued in effect until March 26, 1996 when it was replaced by the Merri Makers Agreement, the term of which will expire on July 31, 2005 and the provisions of which were essentially identical to the Park Caterers Agreement. Under the terms of the Park Caterers Agreement and the Merri Makers Agreement, the licensee was responsible for the day-to-day management and operation of the Reception Center, and, except for specific dates *446 reserved by the Highway Authority, the licensee controlled the use and operation of the facility. Section 3.01 of each Agreement required the licensee to “use its best efforts to manage, operate, and maintain the facility and provide the activities to the general public in order to maximize economic potential.” The term “Activities” was defined as “receptions, banquets, meetings, conferences, seminars, luncheons, dinners, weddings and other similar activities.”
The Park Caterers Agreement provided for a guaranteed minimum payment to the Highway Authority of $150,000 for 1990, $250,000 for 1991 and $350,000 for 1992. No minimum payment was required for 1989. The Merri Makers Agreement required a guaranteed minimum payment of $300,000 per year. These minimum amounts were credited against a percentage of gross receipts that the Highway Authority was entitled to receive. Under the Park Caterers Agreement, this percentage ranged from 10% of gross revenues below $1,000,000 to 24% of gross revenues of $5,000,000 and more. Under the Mem Makers Agreement, the percentage ranged from 14% of gross revenues below $1,000,000 to 20% of gross revenues in excess of $3,000,000.
116 Park Caterers and Merri Makers operated the Reception Center primarily as a catering facility, as contemplated by their respective Agreements. Each Agreement required the licensee to prepare, for approval by the Highway Authority, a marketing program including details of all menus and a schedule of rates. The documents submitted with the Stipulation of Facts included the menus and schedule of rates as revised to March 7, 2002. The Stipulation states that, although the pricing may have changed, the services and menu offerings at the Reception Center were essentially the same during 1996 through 1998. As set forth in the schedule of rates, rental of the Reception Center during the period 8:00 a.m. to 5:00 p.m., Monday through Friday, cost $750 with food service (for which a separate charge was imposed). Without food service, the rental rate was $2,000 for weekdays and $7,500 for weekends. The cost for food ranged from $16.95 per person for breakfast to $28.95 per person for a dinner buffet, with *447 a 20% labor charge and 6% sales tax added to those amounts. The schedule also included rates for specific sit-down menu items.
Beverage options were available in connection with rental of the Reception Center. These included a four or five hour open premium bar, and a four or five hour beer, wine and soda bar. Rental of the facility for a wedding reception cost $6,000 during January, February and December and ranged up to $15,000 during May, June, September and October. The rental fee included complimentary champagne upon guest arrival, tableside cocktail service, and after dinner cordials, as well as a five hour open premium bar with a champagne toast. The cost for food service was in addition to the rental fee.
5. The GSAC Lease.
On January 10, 1997 the Highway Authority, as landlord, and GSAC Partners (“GSAC”) as tenant, signed the GSAC Lease effective as of May 1, 1996 and having an expiration date of October 31, 2017. The leased premises consisted of the Amphitheater and related land area. The Lease also granted to GSAC a non-exclusive easement to use existing parking areas and access roads and areas leading from the parking areas to the Amphitheater, and the right to use the two electronic billboard signs located adjacent to the Garden State Parkway for identification of sponsors and advertising of scheduled events. The Highway Authority retained the right to use the signs for non-commercial purposes. The Authority had the right to terminate the Lease for reasons other than “financial or economic purposes” upon payment to GSAC of a sum equal to the fair market value of the leasehold estate plus an amount sufficient to compensate GSAC “for the loss of unique and irreplaceable ‘franchise’ of owning the exclusive right to use, operate and exploit the Amphitheater.”
For the first lease year, rent was a minimum amount of $1,500,000 plus 100% of the GSAC’s net income in excess of $1,000,000. For the second lease year, the rent was fixed at $1,650,000. Thereafter, minimum rent was $1,650,000. In addition, GSAC was obligated to pay contingent rent based on gross *448 revenues equal to: (i) 15% of gross revenues between $18,700,000 and $21,300,000, or (ii) 5% of gross revenues in excess of $21,300,000 and up to $23,900,000 plus $390,000, or (iii) 10% of gross revenues in excess of $23,900,000 plus $520,000. GSAC agreed to pay all real estate taxes and assessments imposed on the Amphitheater and related land area and on the parking areas.
The GSAC Lease required GSAC to perform renovation work, costing a minimum of $8,700,000, to include the following:
(1) expansion of the Amphitheater to increase the covered seating area by 1,725 seats;
(2) an increase in the lawn seating area capacity by 5,000;
(3) the addition of a minimum of 1,700 new on-site parking spaces;
(4) construction of a new box office with regular and handicapped entry gates;
(5) expansion of rest room facilities;
(6) expansion of concession buildings;
(7) expansion of the two existing plazas by approximately 40,000 square feet of asphalt paving; and
(8) construction of access walkways to the plaza areas.
These items, from the date or dates of their completion, are included in the term Amphitheater Facilities as used in this opinion.
Subject to the Highway Authority’s reserved rights to use the Amphitheater for up to ten ethnic heritage festivals, up to twenty admission-free performances, and a winter holiday celebration, GSAC had the “sole and exclusive right to use, occupy and enjoy the Amphitheater Tract” during the term of the lease for activities including producing and presenting entertainment events and shows, conducting fairs and festivals, as a center for educational conferences, seminars, corporate meetings, shareholder meetings, civic events and graduations or political fund raisers, as a place for selling food and beverages and other merchandise, and for any other lawful purpose “directly related” to the foregoing uses. Scheduling of the Highway Authority’s events was subject and subordinate to GSAC’s schedule of events.
The GSAC Lease required GSAC to use modem business practices “to provide efficient and high quality services to the public”, but the Highway Authority agreed that, although GSAC *449 was obligated to address the Authority’s concerns as to operation of the facility, “the ultimate decision as to what action, if any, should be taken rests solely with Tenant.” GSAC had the specific right to sell alcoholic beverages subject to compliance with certain guidelines attached to the Lease. These included a limitation on alcoholic beverage sales to one or two beverages per person per purchase, a cut-off of the sale of alcoholic beverages one hour prior to the end of a concert, a prohibition against sales to patrons who showed signs of intoxication, and a prohibition against the bringing by patrons of alcoholic beverages into the Amphitheater.
The Highway Authority and GSAC agreed to use “their reasonable best efforts” to present balanced programming at the Amphitheater, but this requirement could not be a basis for declaring GSAC in default because of the “inherently subjective nature” of the requirement. The Highway Authority was entitled to receive all ticket revenues in connection with its events, but GSAC retained the sole and exclusive right to operate, and retain all revenues from concession facilities it operated during Highway Authority events. The lease granted GSAC the right to license concessionaires to sell merchandise, food, and beverages at the Amphitheater. GSAC had the primary right to use existing parking facilities and the exclusive right to use any new parking facilities installed by it pursuant to its renovation obligations. Sponsorship fees attributable to the right to name the Amphitheater were to be split between the Highway Authority and GSAC. Without the consent of the Highway Authority, GSAC had authority to sublease the Amphitheater, to allow mechanics’ or materialmen’s liens to be imposed upon its leasehold estate, and to mortgage its leasehold estate.
II.
Analysis
As explained above, the Remand Opinion was issued in 2000 and was based on the Highway Authority Act as amended by the 1968 Legislation. The Merger Legislation was enacted in 2003. The Authorities contend that whether the Arts Center Complex quali- *450 fíes for exemption for all years under appeal can and should be determined based on the Merger Legislation. I conclude that the impact of the Merger Legislation cannot be evaluated properly without first determining whether, under the 1968 Legislation, the Arts Center Complex qualified for exemption. Therefore, after discussing the general principles applicable to the Authorities’ exemption claims, I will address the issue of qualification for exemption under the 1968 Legislation before proceeding to discuss the significance and impact of the Merger Legislation.
A. General Principles Applicable to Tax Exemptions for Government-Owned Facilities.
One legal principle applicable to claims for property tax exemptions by government entities is that the statutes conferring the exemptions are to be liberally construed. Walter Reade Inc. v. Dennis Tp., 36 N.J. 435, 440, 177 A.2d 752 (1962); Holmdel Tp. v. New Jersey Highway Auth., supra, 329 N.J.Super. at 418-19, 748 A.2d 128. A second is that the governmental entity has the burden of proof as to qualification for exemption, County of Bergen v. Paramus Bor., 79 N.J. 302, 310, 399 A.2d 616 (1979), and, in order to prevail, must establish that “the object or activity for which the [tax] immunity is sought is within the boundaries of the governmental entity’s statutory powers and within the provisions of the specific statute granting the asserted immunity,” Holmdel Tp. v. New Jersey Highway Auth., supra, 329 N.J.Super. at 419, 748 A.2d 128. Two additional relevant legal principles are that leasing of a government-owned facility to a privately-owned entity will not automatically preclude the facility from qualifying for exemption and that the generation of profits from operating the facility also will not automatically preclude exemption.
The Remand Opinion described the significance of leasing to a private entity as follows:
At the outset, we think it plain that the Authority has specific statutory power to enter into leases of the type here. Moreover, as a general proposition, such leasing arrangements do not trigger a loss of the governmental tax immunity, so long as the private enterprise uses or operates the subject property or governmental activity as it was intended to be used or operated under the governing statutory provisions and in a fashion the particular tax immunity was intended to benefit. *451 [Holmdel Tp. v. New Jersey Highway Auth., supra, 329 N.J.Super. at 419-20, 748 A.2d 128 (citations omitted).]
In Borough of Moonachie v. Port of New York Authority, 38 N.J. 414, 185 A.2d 207 (1962), our Supreme Court provided guidance as to the significance of revenue generation by a private lessee of a government-owned facility.
The basic principle ... is that property owned by a public agency but employed primo,riiy to obtain revenue or profit through private business uses is not immune from taxation, but property employed primarily for a public use does not lose immunity because the agency incidentally derives some private business income from it. Stated more precisely for present purposes, a tax exemption based upon a statute specifying a particular public use is clearly lost when the use to which the property is put is foreign to the prescribed use and the revenue motive in adopting the use is the primary or exclusive one.
[Id. at 426-27, 185 A.2d 207 (citation omitted).]
With respect to the Arts Center Complex, the Remand Opinion held that use for a public purpose, in itself, was insufficient to warrant a property tax exemption.
The critical language [in N.J.S.A. 27;12B-16] ... limits the Authority’s tax immunity to projects and property used for the purposes of the enabling act. Such purposes of course are public purposes, but they are discrete public purposes — It is not generally whether the current use serves a public purpose; it is whether it fulfills a purpose that the Authority has been created to perform.
[Holmdel Tp. v. New Jersey Highway Auth., supra 329 N.J.Super. at 425, 748 A.2d 128.]
B. Qualification for Exemption Under the 1968 Legislation.
The Remand Opinion concluded that, under the Highway Authority Act, as originally enacted, construction of the Arts Center Complex was within the statutory powers granted to the Authority, and that the 1968 Legislation grandfathered the Arts Center as a project within the Highway Authority’s statutory powers but only as to “ ‘existing facilities.’ ” Id. at 428, 185 A.2d 207. Therefore, I must determine whether the Arts Center Complex, as it existed and was operated on October 1 preceding each of the years under appeal, constituted a continuation of facilities and activities existing or contemplated by the Legislature in connection with the 1968 Legislation. I conclude that, except for the Amphitheater Facilities as they existed and were operated on October 1, 1995, the assessment date for tax year 1996, the *452 Arts Center Complex, as of October 1 preceding each of the remaining years under appeal, was significantly different, physically and in its operations, from what existed or was contemplated in 1968. The stipulated facts disclose the following differences.
a. The Amphitheater and lawn area had a combined seating capacity of approximately 10,000 in 1968. This was expanded to approximately 17,500 pursuant to the GSAC Lease, and new parking areas were added.
b. As of 1968, no performances were presented at the Amphitheater on Friday or Sunday evenings, times of high traffic volume on the Parkway. Under the GSAC Lease, performances on Friday and Sunday evenings were permitted.
c. As of 1968, the Highway Authority operated the Amphitheater, although it had retained a booking agent to engage performers. Under the GSAC Lease almost total control of the Amphitheater was ceded to GSAC, a private, for-profit entity.
d. As of 1968, sales of alcoholic beverages did not occur on the Arts Center premises, and were not contemplated. Under the GSAC Lease, the sale of alcoholic beverages was specifically permitted.
e As of 1968, parking for events at the Amphitheater was free. Under the GSAC Lease, GSAC was authorized to impose charges for parking and did so for events it presented.
f. As of 1968 the Reception Center did not exist and was not planned or contemplated by the Highway Authority. As of October 1,1995 and thereafter, this facility was operated by a private, for-profit business entity primarily as a catering hall with the objective of “maximizfing] economic potential,”
The Remand Opinion discussed the Amphitheater and related facilities separately from the Reception Center. I will proceed in the same fashion, and will discuss first the qualification for tax exemption of the Amphitheater and related facilities under the 1968 Legislation.
1. The Amphitheater Facilities.
The GSAC Lease was not effective until May 1, 1996. As of October 1,1995, therefore, the physical condition and operations of the Amphitheater Facilities were essentially the same as existed when the 1968 Legislation was enacted. Under the Remand Opinion, the Amphitheater Facilities qualified for tax exemption as they existed in 1968. The qualification for exemption continued for tax year 1996.
By October 1, 1996, however, the facts supporting qualification for exemption had changed because of the signing of the GSAC *453 Lease. The significant expansion of the Amphitheater, and parking and plaza areas accomplished pursuant to the GSAC Lease did not, in itself, automatically preclude these facilities from qualifying for exemption, but, under the Remand Opinion’s focus on “existing facilities,” a material physical expansion could result in a loss of the tax exemption. However, I need not consider at length the impact of the physical changes because the changes in operations of the Amphitheater and parking areas were even more substantial and significant.
Under the GSAC Lease, GSAC assumed nearly total control of the operation of the Amphitheater Facilities other than the Celebrity House. The Highway Authority retained only limited rights to use the Amphitheater, and relinquished almost all control of the artists, programs and other aspects of the operation of the Amphitheater Facilities other than the Celebrity House. This control of the Amphitheater by a private, for-profit company was contrary to Chairman Smith’s testimony before the Study Commission in 1968 that the Authority opposed having “people in private business” operating at the Arts Center.
As permitted by its lease, GSAC imposed charges for parking in connection with the events it presented at the Amphitheater. Free parking was described to the Study Commission in 1968 as one of the distinguishing features of the Arts Center. GSAC served alcoholic beverages at its Amphitheater events. Alcoholic beverages were not served at Amphitheater events as of 1968, and the possibility of such service was not mentioned to the Commission. Even in 1989, when the Investigation Committee conducted its hearings, the Highway Authority would not permit a corporation in the alcoholic beverages industry to become a sponsor of the Arts Center.
Highway Authority Chairman Smith testified before the Study Commission in 1968 that performances would not take place on Fridays and Sundays. No such restrictions were included in the GSAC Lease. Mr. Smith, Vice-Chairman Townsend, and Executive Director Tonti emphasized to the Study Commission the role of the Arts Center as a cultural center and as a facility offering *454 free performances for school children, the underprivileged, and senior citizens. Under the GSAC Lease these became a minor part of the presentations at the Amphitheater, even though the Highway Authority reserved rights to present ethnic heritage festivals and a small number of admission-free performances. Except for Authority’s limited number of events, the scheduling of which generally was subject to GSAC’s approval, GSAC selected the events presented.
The primary purpose of the Amphitheater Facilities, as they existed in 1968 and were operated by the Highway Authority, was the presentation of cultural and educational programs for the benefit of the citizens of New Jersey. During 1996 and the following years under appeal, the Authorities’ primary purpose in operating the Amphitheater Facilities shifted to revenue generation, and the operation ceased to “fulfill[] a purpose that the [Highway] Authority [was] created to perform.” Holmdel Tp. v. New Jersey Highway Auth., supra, 329 N.J.Super. at 425, 748 A.2d 128. This is evidenced by: (1) the financial terms of the GSAC Lease under which the Highway Authority received percentages of revenue, (2) the Authority’s relinquishment of control of the Amphitheater and its operations, (3) the Highway Authority’s abandonment of policies under which free parking was provided, no performances were presented on Friday and Sunday evenings, and the sale of alcoholic beverages at Amphitheater events was not permitted. Although the Reception Center was operated separately from the Amphitheater Facilities, and will be discussed separately below, the Park Caterers and Merri Makers Agreements reflect the Highway Authority’s focus on revenue generation, particularly in the percentage rent provisions of the Agreements, and the express requirement that the Reception Center be operated so as to maximize revenue.
The availability of alcoholic beverages at GSAC events in the Amphitheater, subject to limited controls of dubious effectiveness, and at the Reception Center, at open bars with no controls, is strikingly inconsistent with the purpose of the Highway Authority (and later the Turnpike Authority) to “remove the present handicaps and hazards on the congested highways in the State, and to *455 provide for the construction of modem express highways embodying every known safety device.” N.J.S.A. 27:12B-2. See also N.J.S.A. 27:23-1 (containing a virtually identical description of the purpose of the Turnpike Authority).
Based on the foregoing discussion, I conclude that the Amphitheater Facilities, as they existed as of October 1, 1996 and thereafter during the tax years under appeal, were operated in a manner foreign to the operation understood and contemplated by the Legislature in enacting the 1968 Legislation, and in a manner foreign to the purposes the Authorities were created to perform. Accordingly, the Amphitheater Facilities ceased to qualify for tax exemption commencing in tax year 1997.
Although the Celebrity House was not included in the premises covered by the GSAC Lease, the facility was used as part of, and ancillary to, the operation of the Amphitheater. Therefore, it did not qualify for exemption because the Amphitheater did not qualify. See Pompton Lakes Senior Citizens Housing Corp. v. Pompton Lakes Bor., 16 N.J. Tax 331, 338-39 (Tax 1997) (discussing decisions holding that an ancillary facility can qualify for exemption only if the main facility qualifies).
The electronic billboard signs used by GSAC pursuant to the GSAC Lease also were used ancillary to the use of the Amphitheater and, therefore, did not qualify for exemption. The use of these signs by GSAC is distinguishable from the sign usage at issue in South Jersey Transportation Authority v. City of Pleasantville, 312 N.J.Super. 438, 712 A.2d 215 (App.Div.1998). There the signs in question were used to generate incidental income in connection with the Transportation Authority’s tax exempt operation of the Atlantic City Expressway, and thus qualified for property tax exemption. Id. at 440-41, 712 A.2d 215. Here the signs were used primarily by, and incidental to, the non-tax exempt operations of a private, for-profit entity.
2. The Reception Center.
I turn now to the Reception Center. The Remand Opinion poses two questions with respect to this facility: (1) was it in the *456 planning stages as of 1968, and (2) if approved by the Highway Authority as planned in 1968, was the operation of the Reception Center under the Park Caterers Agreement and Merri Makers Agreement “ ‘foreign’ to what the Legislature grandfathered.” Holmdel Tp. v. New Jersey Highway Auth., supra, 329 N.J.Super. at 432, 748 A.2d 128.
Based on the Study Commission hearings as described above, I find and conclude that the Reception Center was not in the planning stages as of enactment of the 1968 Legislation. Consequently, it was not grandfathered by that Legislation. I also find and conclude that the operation of the Reception Center during all years under appeal was “foreign” to what the 1968 Legislation intended to grandfather. I reject the Authorities’ argument that the use of the Reception Center constituted merely a continuation of activities conducted in the Celebrity House as of 1968. The primary use of the Reception Center under the Park Caterers and Merri Makers Agreements was as a catering facility with a capacity of 350 persons at a sit-down dinner and 500 persons at a stand-up reception. The Celebrity House, with a capacity of 70 persons, was not used as a catering facility before or as of 1968, and was not used for receptions until 1972 or thereafter. In 1968, the Celebrity House was used, if at all, only as an adjunct to the Amphitheater without an independent revenue-generating purpose. Under the Park Caterers and Merri Makers Agreements, the primary purpose of the Reception Center was to generate revenue for the Authorities, a purpose that was partially accomplished, as discussed above, by allowing the licensee to operate open bars at catered events. I concur with the statement contained in the legal opinion rendered by the Office of Legislative Services that “construction of the [Reception Center] appears to be exactly the type of project that the Legislature sought to control in enacting [the 1968 Legislation].” For all the foregoing reasons, the facility did not qualify for exemption for any of the years under appeal.
C. The Merger Legislation.
Having determined that, except for the Amphitheater Facilities in tax year 1996, none of the Arts Center Complex qualified *457 for exemption under the 1968 Legislation, I now must address the impact, if any, of the Merger Legislation on my analysis. The primary focus of this legislation was to facilitate the integration of the Highway Authority and its facilities and operations into the Turnpike Authority in a manner that would promote cost savings, assure the safe operation of both the Garden State Parkway and New Jersey Turnpike, and assure the continuation of proper maintenance and repair of both roadways. Several portions of the Merger Legislation expressly set forth or reflect this focus. Thus, L. 2003, c. 79, § 1, codified as N.J.S.A. 27:23-41, containing legislative findings, provides in paragraph (a):
In order to deal with the problems of increasing traffic and congestion, it is necessary to provide for a more coordinated and rational organization of the State’s two major toll roads by abolishing the New Jersey Highway Authority and providing for the acquisition by the New Jersey Turnpike Authority of the Garden State Parkway and all other projects of the New Jersey Highway Authority.
[N.J.S.A. 27:23-41(a).]
Paragraph (b) refers to greater efficiency as a result of the merger, N.J.S.A. 27:23-41(b), and paragraph (c) refers to resulting economies of scale and financial savings resulting in “a safer, less congested, better maintained and improved road network.” N.J.S.A. 27:23-41(c). Paragraph (d) states that the merger will “permit implementation of effective remedies to address the financial, operational and administrative problems that have hitherto plagued the E-Z Pass system.” N.J.S.A. 27:23-41(d).
Under N.J.S.A. 27:23-42(b)(1), upon the effective date of the transfer, the Turnpike Authority assumed “all of the powers, rights, assets and duties of the Highway Authority to the extent provided by this act.” All Highway Authority officers and employees became “employees of the [Turnpike Authority] until determined otherwise by the authority.” N.J.S.A. 27:23-47(b)(3). The Turnpike Authority received express authorization “to act in its own name or in the name of the Highway Authority as may be convenient or advisable under the circumstances from time to time.” N.J.S.A. 27:23-5. Under N.J.S.A 27:23-42(b)(7), all rules and regulations of the Highway Authority “continue[d] in effect as the rules and regulations of the [Turnpike Authority] until amended, supplemented or rescinded.”
*458 The legislative history of the Merger Legislation reflects concerns consistent with the foregoing statutory provisions. Executive Order No. 15, appointing the Toll Road Consolidation Study Commission to study the merger of the Highway Authority and Turnpike Authority, contains no specific mention of the Garden State Arts Center. The Commission’s report does not refer to the Arts Center, and discusses only funding of road improvements, operating efficiencies, and the EZ Pass situation.
The Statement to the initial version of the Merger Legislation, introduced on February 27, 2008 as Senate Bill No. 2352, refers to the EZ Pass dilemma, the necessity for providing funding for road improvements, and the economies of scale that will be realized from the consolidation of the Turnpike Authority and Highway Authority, and anticipates that safer and better operated and maintained roadways will result from the merger. The Statement describes the transfer to the Turnpike Authority of Highway Authority “projects and functions” as including the Garden State Parkway and Garden State Arts Center and states that the bill “would permit the transfer of the Garden State Arts Center to the control of the New Jersey Sports and Exposition Authority.” The Senate Transportation Committee Statement to that Committee’s March 17, 2003 substitute for the original bill contains similar language except that the Statement describes the substitute bill as permitting transfer of the Arts Center to the Sports and Exposition Authority “or to any other entity.” The Statements of the Assembly Transportation Committee and Assembly Appropriations Committee to the Senate Committee Substitute Bill, contain language relating to the Arts Center Complex similar to that appearing in the Senate Statements.
The Authorities contend that foregoing legislative history is not significant because the plain language of the relevant provisions of the Merger Legislation require that the Arts Center Complex be granted a property tax exemption for 2004 and confirm the legislative intent and determination that the Complex qualified for exemption for tax years 1996 through 2003. The Authorities rely on the following three provisions of the Merger Legislation: (1) the express granting of a tax exemption to “transportation pro *459 jects” in N.J.S.A. 27:23-12, and the definition of “transportation projects” as including “highway projects,” N.J.S.A. 27:23-4, which are defined to include “the Garden State Arts Center,” ibid.; (2) the language in N.J.S.A 27:23-12 in which the Legislature “reaffirms” the tax exemption for “all existing facilities and property” transferred from the Highway Authority to the Turnpike Authority; and (3) the failure of the Legislature to attempt to modify or repeal the tax exemption permitted under the 1968 Legislation after the Investigation Committee hearings in 1988 and 1989.
Holmdel describes the legislative history as demonstrating that the tax exemption for the Arts Center Complex was not a significant concern of the Legislature. Holmdel further asserts that if, in enacting the Merger Legislation, the Legislature was, or is deemed to have been, informed as to the nature of the facilities and operations at the Arts Center Complex, the Legislature could not have intended to designate aleohol-serving facilities having direct access only to the Garden State Parkway as “public and essential governmental functions,” N.J.S.A. 27:2.3-12, and grant them a tax exemption. Holmdel also contends that the provisions of the Merger Legislation authorizing the Turnpike Authority to dispose of the Arts Center confirm that the Legislature did not regard the Arts Center as an essential governmental function.
The following general guidelines are applicable in resolving issues of statutory interpretation:
Ordinarily, we derive a statute’s meaning by first looking to its plain language. If the language’s meaning is clear and unambiguous, it will be given effect “absent any specific indication of legislative intent to the contrary.”
However, in determining whether contrary intent exists, courts may examine whether a provision’s plain meaning supports a result that is consistent with the overall statutory scheme. Further inquiry into a statute’s intended meaning is warranted, for example, where the plain meaning seems inconsistent with the statutory scheme.
[Chase Manhattan Bank v. Josephson, 135 N.J. 209, 225, 638 A.2d 1301 (1994) (citations omitted).]
See also Koch v. Director, Div. of Taxation, 157 N.J. 1, 722 A.2d 918 (1999) (adopting the principles set forth in Chase Manhattan Bank and adding that statutory construction “ ‘is subordinate to the goal of effectuating the legislative plan as it may be gathered *460 from the enactment read in full light of its history, purpose and context.’ ” Id. at 7, 722 A.2d 918 (citation omitted).).
Three additional guidelines also are relevant. One is that no provision of a statute should be read in a fashion to render it redundant. “Since the Legislature is presumed to be fully conversant with its legislation, courts are to avoid constructions that make statutory provisions redundant or meaningless.” State v. Wright, 107 N.J. 488, 502-503, 527 A.2d 379 (1987) (citations omitted). A second is that specific provisions of a statute control more general provisions covering the same subject matter. New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 661 A.2d 778 (1995) (“It is a well established precept of statutory construction that when two statutes conflict, the more specific controls over the more general.” Id. at 591, 661 A.2d 778 (citations omitted).). A third is that the courts “presume that the Legislature is familiar with existing judicial statutory interpretations.” Chase Manhattan Bank v. Josephson, supra, 135 N.J. at 227, 638 A.2d 1301.
Applying these guidelines to the interpretation of N.J.S.A. 27:23-12 results in the following analysis. The first sentence of the statute, as amended by the Merger Legislation, provides that any “transportation project” (the definition of which includes “highway project”) ... shall be exempt “from taxation.” The Arts Center is designated as a “highway project” and therefore is included in the exemption. The tax exemption which the Legislature “reaffirms” in the last sentence of the statute is “from local taxes or assessments.” Unless the tax exemptions set forth in these two sentences are treated as having different meanings, then the last sentence of the statute is redundant. The Legislature has no need to “reaffirm” the exemption from property taxes if that exemption was already encompassed by the inclusion of the Arts Center Complex in the term “transportation project.”
Both sentences can be given meaning and significance by interpreting the general exemption from taxes granted to transportation projects in the first sentence as distinct from the specific exemption from property taxes that the Legislature “reaffirms” in *461 the last sentence. By using the word “reaffirm” [5] the Legislature appears to have intended to continue in effect the property tax exemption to the extent it was available under the 1968 Legislation and does not appear to have intended to broaden the exemption.[6]
This interpretation of N.J.S.A. 27:23-12 is consistent with the general scheme of the Merger Legislation. As set forth above, the primary focus of the Legislation was to promote and effectuate cost savings, efficiency, and a safer road system. See N.J.S.A. 27:23-1 (describing as one of the Turnpike Authority’s purposes the construction of highways “embodying every known safety device”) and N.J.S.A. 27:23-41(c) (stating that the merger of the Highway Authority and Turnpike Authority will result in “a safer ... road network”). As discussed above, commencing in 1996 and continuing through 2003 when the Merger Legislation was enacted, the Arts Center Complex was no longer operated in a manner that fulfilled the purposes for which the Highway Authority and Turnpike Authority were created. Consequently, the Legislature could grant a property tax exemption to the Complex as it existed in 2003 only by modifying or ignoring those purposes. The Merger Legislation not only contains no modification of the road safety purpose of the Turnpike Authority but reinforces that purpose.
My conclusion that the first sentence of N.J.S.A. 27:23-12, providing that “the Authority shall not be required to pay any taxes or assessments upon any transportation project,” should not be construed as broadening the property tax exemption granted to the Art Center Complex is reinforced by the usage of the terms *462 “transportation project(s)” and “highway project(s)” elsewhere in the Merger Legislation. In general, these terms are used to refer only to roadway projects. For example, N.J.S.A 27:23 — 5(h) confers on the Turnpike Authority the power to:
establish rules and regulations for the use of any project including restrictions on the type, weight and size of vehicles utilizing transportation projects, and also including the power to exclude from any part of a highway project any traffic other than passenger automobiles if the authority finds that such part is not suitable or sufficient as a highway to carry mixed traffic.
[N.J.S.A 27:23-5(h).]
N.J.S.A 27:23-25 prohibits vehicles from making use of “any highway project” operated by the Turnpike Authority “except upon the payment of such tolls, if any, as may from time to time be prescribed by the Authority.” Under N.J.S.A 27:23-31 transportation of hazardous materials “in or upon any ... highway project” is prohibited. While some of these provisions could be read to apply to the internal roadways and parking areas at the Arts Center Complex, such a reading would not be reasonable or sensible. See, e.g., Schierstead v. City of Brigantine, 29 N.J. 220, 230, 148 A.2d 591 (1959) (stating that statutes should be read “sensibly rather than literally”).
As discussed above, the definition of “transportation project” includes “highway projects”, and the definition of a “highway project” expressly includes the Arts Center. N.J.S.A 27:23-4. The Merger Legislation’s usage of the terms “transportation projeet(s)” and “highway project(s),” as described in the preceding paragraph, indicates that, in granting a tax exemption to “transportation projects” in the first sentence of N.J.S.A. 27:23-12, the Legislature was not focused on or concerned with the scope or nature of the exemption granted to the Arts Center Complex.
Another aspect of the Merger Legislation that indicates a legislative intent not to expand the property tax exemption granted to the Arts Center Complex beyond that available under the 1968 Legislation is the provision authorizing the Turnpike Authority to “transfer, sell, dispose of, or otherwise relinquish all right, title or interest in the Garden State Arts Center, and any related or auxiliary facilities, to the New Jersey Sports and Exposition Authority ... or to any other entity____” N.J.S.A. 27:23-5(u). No *463 similar authority was granted with respect to the Garden State Parkway or New Jersey Turnpike. The term “any other entity” is not limited to a governmental agency or authority or even to an entity otherwise qualifying for a property tax exemption. Thus, the status of the Arts Center Complex as an “essential governmental function!]” for purposes of the tax exemption provisions of N.J.S.A 27:23-12, is contradicted by the Legislature’s willingness to permit its disposition.
Based on the preceding statutory analysis and discussion of legislative history, I reject the Authorities’ argument that, because the Legislature must be deemed to have knowledge of the Eemand Opinion in enacting the Merger Legislation, the provisions of N.J.S.A. 27:23-12 should be interpreted as a direct legislative response to the Eemand Opinion, evidencing an intent to grant or confirm an exemption for the Arts Center Complex as it existed in 2003. The analysis demonstrates that the language of the Merger Legislation does not support the Authorities’ interpretation, and legislative history makes no mention of the Eemand Opinion. When the Legislature has intended to respond to a judicial decision with which it disagrees, that intent is often stated expressly in committee statements to proposed legislation. See, e.g., Senate Revenue Finance and Appropriations Committee Statement to Senate Bill No. 1749 (1985), discussed in Liberty Mut. Ins. Co. v. State, Dep’t of the Treasury, Div. of Taxation, 17 N.J. Tax 457, 463 (Tax 1998) (expressly describing the legislation as intended to reverse a holding of the New Jersey Tax Court); Senate Economic Growth, Agriculture and Tourism Committee, Statement to Senate Bill No. 2402 (March 17, 2003) (describing amendments included in the bill as responses to “substantive issues raised in a series of recent court decisions”).
I also reject the Authorities’ argument that the absence of legislative action to revoke the tax exemption of the Arts Center Complex after the Investigation Commission hearings in 1988 and 1989 indicates a legislative intent to confer an exemption on the Eeception Center as it existed and was about to be operated as of the dates of the hearings. Our Supreme Court has characterized legislative silence as a “ ‘weak reed upon which to lean’ and a ‘poor *464 beacon to follow’ in construing a statute.” Amerada Hess Corp. v. Director, Div. of Taxation, 107 N.J. 307, 322, 526 A.2d 1029 (1987) (citation omitted).[7] I conclude that the absence of legislative action, between 1989 and enáctment of the Merger Legislation in 2003, addressing the qualification of the Arts Center Complex for tax exemption should not be construed as reflecting a legislative intent contrary to the above analysis.
The Merger Legislation did no more than continue in effect the property tax exemption for the Arts Center Complex included in the grandfathering provisions of the 1968 Legislation. For the reasons set forth above, I have concluded that the Arts Center Complex failed to qualify for exemption under the 1968 Legislation (except for the Amphitheater Facilities in 1996), and the Merger Legislation does not require a change to that conclusion.
D. Constitutional Issues.
Because I have held that, for tax year 1996, the Amphitheater Facilities qualified for exemption, I must address Holmdel’s constitutional arguments under N.J. Const, art. VIII, § 1, ¶ 1 (requiring that property be assessed “under general laws and by uniform rules”) and art. IV, § 7, ¶ 9 (prohibiting special laws) as they apply to that year. I reject the arguments. Our Supreme Court has held that N.J. Const, art. VIII, § 1, ¶ 1 prohibits the granting of an exemption “based on the personal status of the owner rather than on the use to which the property is put.” New *465 Jersey Turnpike Auth. v. Washington Tp., 16 N.J. 38, 44, 106 A.2d 4 (1954). As of October 1, 1995, the Amphitheater Facilities were operated in a manner consistent with the Highway Authority’s statutory purpose. Consequently, the Facilities qualified for exemption under N.J.S.A. 27:12B-16 based on their use and not based on the identity of the owner. Thus the exemption complies with the constitutional requirements.
In granting the exemption, N.J.S.A 27:12B-16 does not constitute a special law in violation of N.J. Const, art. IV, § 7, ¶ 9. Our Supreme Court has articulated the following method of analysis to be used in determining whether a statute constitutes a prohibited special law:
(W]e first discern the purpose and object of the enactment. We then undertake to apply it to the tactual situation presented. Finally we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.
[Vreeland v. Byrne, 72 N.J. 292, 300-301, 370 A.2d 825 (1977).]
Accord Phillips v. Curiale, 128 N.J. 608, 627, 608 A.2d 895 (1992) (quoting from Vreeland). I discussed above the purposes of the Highway Authority Act. The exemption granted to the Amphitheater Facilities was, for tax year 1996, rationally and reasonably related to those purposes.
Because I have held that neither the Amphitheater Facilities nor the Reception Center qualified for exemption for tax years 1997, 1998, 2000, 2001, 2002, and 2004, I need not address Holm-del’s constitutional arguments as applied to those years. Similarly, because I have held that the Reception Center did not qualify for exemption for tax year 1996, I need not address the constitutional arguments as they apply to that facility for that year. I note, however, that if I had interpreted N.J.S.A. 27:12B-16 or N.J.SA 27:23-12 to grant an exemption to the Reception Center for 1996 or to the Amphitheater Facilities or Reception Center for 1997, 1998, 2000, 2001, 2002, or 2004, the statutes, for the reasons set forth above, would not constitute special laws in violation of N.J. Const, art. IV, § 7, ¶ 9, but the granting of the exemption could constitute an unconstitutional application of the statutes under N.J. Const, art. VIII, § 1, ¶ 1 as interpreted in New Jersey *466 Turnpike Authority v. Washington Tp., supra, 16 N.J. at 44, 106 A.2d 4 (1954).
I have found and concluded that, for tax years 1997,1998, 2000, 2001, 2002, and 2004, the Arts Center Complex (comprising the Amphitheater Facilities and Reception Center) was not used for the public purpose contemplated by the Highway Authority Act or Turnpike Authority Act, and, for tax year 1996, the Reception Center was not used for such a purpose. If the Arts Center Complex were owned by a private party and used as described above, it would not have qualified for tax exemption for 1997,1998, 2000, 2001, 2002 or 2004, and the Reception Center would not have qualified for exemption for 1996. Ownership by the Highway Authority or Turnpike Authority cannot change the result because the exemption, if granted, would be based on the identity of the property owner and not on the use of the property in accordance with the enabling statutes. “Unless compelled to do otherwise, courts seek to avoid a statutory interpretation that might give rise to serious constitutional questions.” Silverman v. Berkson, 141 N.J. 412, 417, 661 A.2d 1266 (1995). My conclusion that N.J.S.A. 27:12B-16 and N.J.S.A. 27:23-12 did not grant an exemption to the Arts Center Complex (except for the Amphitheater Facilities in 1996) avoids this constitutional issue.
E. Conclusion.
I will enter an Order denying the entire Arts Center Complex a property tax exemption for the years 1997, 1998, 2000, 2001, 2002, and 2004, but granting a tax exemption to the Amphitheater Facilities for 1996 and denying the exemption to the Reception Center for that year. The appeals will be scheduled for trial on the issue of value.

 The Arts Center also contained a Vietnam Veterans Memorial, a nature area, a New Jersey Turnpike Authority Maintenance Department building and yard, and a New Jersey State Police barracks. These facilities are not at issue in these appeals and are excluded from the term "Arts Center Complex.”.

 In 2003 the Highway Authority was merged into the Turnpike Authority. L. 2003, c. 79. Consequently, the Turnpike Authority is deemed substituted for the Highway Authority in the appeals pending for tax years 1996, 1997, 1998, 2000, 2001 and 2002. References to the Highway Authority, however, refer to actions taken by, or personnel of, that Authority before the merger. The Highway Authority and Turnpike Authority are referred to together as the “Authorities.”

 The statute was amended in 1988, L. 1988, c. 177, § 1, to substitute the Department of Environmental Protection.

 The Celebrity House is not part of the premises covered by the GSAC Lease, the Park Caterers Agreement, or the Merri Makers Agreement. I infer that, during the years under appeal, it continued to be used in connection with events at the Amphitheater in a manner similar to that described by Ms. Horan and Mr. Zilocchi.

 “Affirm” is defined as “validate, confirm.” Merriam Webster's Collegiate Dictionary 20 (10th ed.1996). The prefix “re” means "again: anew.” Id. at 971. Thus “reaffirm” means to validate or confirm again or anew.

 Another possible interpretation of the two sentences is that the second sentence reaffirmed, for years up to 2003, the property tax exemption available to the Arts Center Complex under the 1968 Legislation, and the first sentence granted a broader exemption to the Complex, as it existed in 2003, for tax years 2004 and thereafter. I reject this interpretation based on the discussion in the main text following this footnote.

 Justice Scalia has described the insignificance of legislative inaction even more colorfully.
[E]ven accepting the flawed premise that the intent of the current Congress, with respect to the provision in isolation, is determinative, one must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the failure to enact legislation____[It is] impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice.
[Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 671-72, 107 Sup.Ct. 1442, 1472-73, 94 L.Ed.2d 615, 656-57 (1987) (dissenting opinion), quoted in Amerada Hess supra, 107 N.J. at 323, 526 A.2d 1029.]